**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Leo JAMES, Defendant–Appellant.**

**No. 89–3119.**

United States Court of Appeals, Seventh Circuit.

Argued May 18, 1990.

Decided Feb. 1, 1991.

As Amended Feb. 6, 1991.

Sean Martin, Asst. U.S. Atty., Office of the U.S. Atty. and Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Chris Averkiou, Chicago, Ill., for defendant-appellant.

Before COFFEY, RIPPLE and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Defendant-appellant Leo James appeals his conviction and sentence for conspiring to transport stolen bonds in violation of 18 U.S.C. § 371 and interstate transportation of stolen bonds in violation of 18 U.S.C. § 2314. We affirm.

## I. FACTS AND PROCEEDINGS BELOW

On June 1, 1989, a grand jury returned a seven-count indictment against Robert Harrod, Roy Ange, Frances Hellinger, Charles Beyer, and the defendant-appellant Leo James, alleging numerous crimes related to the interstate transportation of stolen bonds. Two counts were filed against the defendant James. Count One charged all five defendants, including James, with conspiracy to transport stolen bonds having a value in excess of $5,000 in interstate commerce, in violation of Title 18, U.S.C. § 371. Count Two charged the defendant James alone with interstate transportation of six stolen bonds, in violation of Title 18, U.S.C. § 2314. Count Three charged Harrod and Beyer with interstate transportation of stolen bonds, and Counts Five and Six charged Harrod and Hellinger with interstate transportation of stolen bonds. Counts Four and Seven charged Ange with interstate transportation of stolen bonds. Harrod, Hellinger, and Beyer pled guilty while the defendant James went to trial on the two counts of the indictment; Ange, a fugitive at the time of trial, was later arrested and pled guilty.

On July 31, 1989, defendant James went to trial on the charges of conspiracy, 18 U.S.C. § 371 and transportation of stolen securities, 18 U.S.C. § 2314. Harrod testified on behalf of the government at James' trial and stated that James called him in April 1984 to ask him if he would cash some bonds for him. Although they had not spoken for almost 20 years, Harrod agreed to negotiate the bonds, and James sent him six $5,000 New York municipal bonds via Federal Express from his home in Tucson, Arizona, to Harrod in Joliet, Illinois.[1] On May 18, 1984, Harrod took photocopies of the bonds to Stoffan & Sons, a Joliet, Illinois, brokerage firm, to inquire as to whether the bonds were stolen. Harrod testified that the reason he brought photocopies of the bonds rather than the bonds themselves was to avoid proffering direct evidence in the event that the bonds were actually stolen, thus allowing him to sell the actual bonds "on the market" if Stoffan & Sons advised him that the bonds were stolen. Believing the bonds to be legitimate, Stoffan & Sons agreed to sell the bonds and gave Harrod a check for $22,897.50. Harrod took the check to Stoffan & Sons' bank in Joliet, obtained two cashier's checks, forwarded them to James in the amount of $6,250 and $7,000, and kept the remaining money. Harrod testified that he requested the drafting of two separate cashier's checks in James' name in order that he might keep the checks under the $10,000 Internal Revenue Service monetary reporting requirement.

Harrod also testified at trial that while visiting James in Arizona approximately two weeks later in late May 1984, Stoffan & Sons contacted him and advised him that the bonds they had cashed for him were in fact stolen, and that they wanted to be reimbursed. Harrod testified that when he mentioned the stolen bonds to James, James replied, "Yeah," and he neither acted surprised nor did he deny that they were stolen. Harrod told James that he was interested in obtaining more bonds to nego-

---

[1] Harrod casually knew James in approximately 1965 when James was a bartender in Joliet. James testified that he contacted Harrod be- cause he remembered from 20 years before that Harrod had a furniture business but was involved in "other things on the side...."

tiate. James replied that he knew a person in New York, Roy Ange, who could secure more bonds.

A short time later, Ange, Harrod and defendant James met in Arizona and discussed the sale of more stolen bonds. Ange stated he could get bonds from New York, which he said had been stolen by his nephews. James, upon receipt of these bonds, forwarded them to Harrod in Illinois who in turn arranged for the cashing of the same. At trial, Harrod testified that Ange admitted that the bonds were stolen from a brokerage firm in New York in the presence of James and Harrod.

Harrod further testified at trial that James sent him a second set of nine $5,000 New York General Obligation bearer bonds sometime in the summer of 1984.[2] At this time Harrod recruited a Charles Beyer to aid in the selling of the bonds, and on May 24, 1984, Beyer went to an E.F. Hutton office in Flossmoor, Illinois, and opened an account prepatory to selling the nine bonds. E.F. Hutton sold the bonds for Beyer and gave him a check for $19,757 on June 4, 1984. Harrod sent James the coupons from the second set of bonds, and James cashed them. Harrod testified that the coupons "went to Boston, Massachusetts, and they were reported stolen; they sent the coupons back to the bank, and Leo [James] had to pay the money back."

In late August 1984, James sent Harrod six $5,000 North Carolina Municipal Power Agency bonds.[3] Harrod gave the bonds to Beyer, who offered them for sale to a Prudential–Bache office in Olympia Fields, Illinois. Prudential–Bache sold the bonds and gave Beyer a check for $37,745.63; Beyer cashed the check, and the proceeds were divided among the participants.[4]

In early September 1984, Harrod received a fourth set of bonds from James and recruited Frances Hellinger to cash the bonds for him. Hellinger cashed the bonds at the Oakbrook, Illinois, office of Merrill, Lynch. A short time later, Ange forwarded Harrod a fifth set of bonds from New York, and Hellinger cashed them for Harrod at Richard Vance, a Joliet, Illinois, brokerage firm.[5] Harrod testified that he used Hellinger and Beyer to redeem the bonds in order to deflect attention and suspicions that might have arisen had just one individual attempted to cash a large amount of bonds at one time. Harrod also testified that he never told James or Ange about Hellinger and Beyer's identities in order that he might insulate the people in the conspiracy from one another.[6]

Harrod stated at trial that in January 1985 he began cooperating with federal agents, resulting in the agents' taping three phone calls in January and February of 1985 between Harrod and the defendant James, which were later admitted at trial.

**2.** Ed Georgalas, from Donald Sheldon Securities in New York, testified on behalf of the government. He stated that in March 1984, nine $5,000 New York General Obligation bonds were "missing" from the vault at Donald Sheldon Securities. The bonds were stored in the vault and then apparently sent via registered mail to the client, but the client reported that they never received the bonds. Sheldon Securities never located these bonds.

**3.** John Peters, from Manufacturers Hanover Trust in New York, testified on behalf of the government. He stated that during a routine audit of the New York City vault at Manufacturers Hanover in October 1984, bank officials learned that five $5,000 North Carolina Municipal Power Agency bonds were missing in a "mysterious disappearance." The bonds disappeared sometime between August 6, 1984, and October 1, 1984.

**4.** The agreement among the participants concerning the division of the proceeds was that the suppliers of the bonds in New York would receive 20 to 30 percent of the proceeds, the person who actually cashed the bonds would receive 20 to 30 percent, and Harrod, Ange and James would split the remainder in thirds. (This agreement covered subsequent sales of bonds.)

**5.** Between the sale of the fourth and fifth sets of bonds, Harrod and Ange agreed to eliminate defendant James as the middle man in order that they might increase their individual return from the fraudulent bond sale scheme.

**6.** Sometime between May and September of 1984, Harrod testified that he also received three $100,000 bonds and three $5,000 Ohio bonds from James. Harrod testified that he was unable to sell these bonds profitably, and that he sent them back to James.

The tapes revealed that Harrod and James discussed the sale of numerous sets of bonds, including another $900,000 worth of bonds which Ange obtained but later had to return. During these phone conversations, Harrod and James spoke in code, using the terms "forms" or "racing forms" to refer to the bonds, "jockeys" to refer to Ange's nephews in New York, and "agents" to refer to the buyers of the bonds. Harrod testified that he, Ange, and defendant James had agreed during their first meeting in May 1984 to use code words while speaking on the telephone to protect themselves from any government-instituted wire taps.

At trial, defendant James, testifying on his own behalf, admitted that he had received $7,000 from the sale of the first set of bonds, and approximately $1,100 to $1,200 from the sale of the second set of bonds. James admitted his role was to send the bonds to Harrod, who would then sell them, and would then give James "X amount" of the proceeds. James admitted that he learned the first set of bonds was stolen after Harrod cashed them and also admitted that at the first meeting between Ange, Harrod and himself in Arizona that Ange "stated that they were stolen bonds...." James further stated that when he and Ange discussed the proposal to send the second set of bonds to Harrod, Ange advised him that the bonds were stolen. James also admitted he used a "code" with Harrod over the telephone when referring to the bonds, Ange's nephews in New York, and the buyers of the bonds so that he might protect himself from any government-instituted wire taps. Finally, James confessed that he knew the stolen bonds were being forwarded from New York.

On August 2, 1989, after a three-day jury trial, James was found guilty on both counts in the indictment. At sentencing, the district court imposed a two-year prison sentence on Count 1 (the conspiracy count), five years' probation on Count 2 (the substantive interstate transportation count) to run consecutively, and James was ordered to make restitution in the amount of $80,399.

## II. ISSUES FOR REVIEW

On appeal, the defendant-appellant James contends that (1) Counts One and Two of the indictment are defective in that they fail to charge an offense and fail to identify either the stolen bonds, much less the owners thereof; (2) the evidence at trial was insufficient to establish that any of the bonds were stolen; (3) the conspiracy instruction given to the jury failed to state that an agreement was necessary to convict and that the term "unlawful purpose," used by the district court therein is vague; and (4) he was subject to a harsher sentence than his co-defendants because he exercised his right to a jury trial.

## III. DISCUSSION

### A. Sufficiency of the Indictment

Defendant-appellant James argues on appeal that the indictment failed to allege sufficient material facts necessary to describe the commission of the offense. Specifically, James contends that Count One of the indictment, the conspiracy count, was defective because it failed to either "specify the stolen property" or "identify the owner of the property"; similarly, James argues that Count Two, the substantive interstate transportation count, was also defective because it failed to allege "ownership of the bonds" and "to whom the bonds belonged." James contends that because the stolen bonds were identified as bearer bonds, the bonds are presumed not to be stolen unless the indictment identifies the competing title holder.

An indictment is sufficient if it satisfies the following test: (1) It states all the elements of the offense charged; (2) It informs the defendant of the nature of the charge so that he may prepare a defense; and (3) It enables the defendant to plead the judgment as a bar to later prosecution for the same offense. *United States v. Roman*, 728 F.2d 846, 850 (7th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984). The Federal Rule of Criminal Procedure 12(b)(2) provides that a defendant must raise any objection to the

indictment prior to trial. Because of James' failure to raise objections to the indictment prior to trial, his indictment should "be upheld unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted." *United States v. Gironda*, 758 F.2d 1201, 1210 (7th Cir.), *cert. denied*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985) (citations omitted).

■ We disagree with the defendant James' argument that the conspiracy count in the indictment was defective because it failed to specify in sufficient detail the stolen property or the ownership of the bonds. Count One of the indictment charged that James was a member of a conspiracy to transport stolen bonds having a value in excess of $5,000 in interstate commerce in violation of Title 18, U.S.C., § 371. The elements of a conspiracy count under § 371 are: "(1) an agreement; (2) an overt act in furtherance of the conspiracy; and (3) knowledge of the conspiratorial purpose." *United States v. Frans*, 697 F.2d 188, 192 (7th Cir.1983). Count One was over five typewritten pages in length and listed in minute detail the following: (1) dates of the transactions; (2) locations of the transactions; (3) addresses of the transactions; (4) names of the defendants and others involved; (5) amounts of the checks received; (6) recipients of the checks issued; and (7) bonds involved by issuing authority and certificate numbers. Moreover, the indictment gave James ample notice as to the particular identity of many of the bonds that were alleged to have been stolen, including the six North Carolina bonds he was accused of illegally transporting in interstate commerce in Count Two. Count One specifically incorporated by reference Count Two as an overt act in the conspiracy. Also, James, were he desirous of more definitive facts, could and should have moved for a bill of particulars under Federal Rule of Criminal Procedure 7(f). Under this court's precedence, it is clear that the government alleged the necessary elements of the crime, and James' argument on appeal about a perceived lack of evidentiary detail in the conspiracy count is thus without merit. *Id.*

■ The substantive count, Count Two, also clearly alleged an offense under Title 18 U.S.C., § 2314. Section 2314 has the following elements: (1) interstate transportation of stolen, converted or fraudulently taken securities of at least $5,000; and (2) fraudulent intent. *United States v. Mosley*, 786 F.2d 1330, 1334 (7th Cir.1986). Count Two alleged that the defendant transported North Carolina Municipal Power Authority bonds in excess of $5,000 knowing that the bonds had been stolen. Thus, Count Two sufficiently alleged an offense and "[n]othing more would be accomplished by requiring the government to include a greater amount of information in the indictment." *United States v. Johnson*, 805 F.2d 753, 759 (7th Cir.1986).

■ Finally, James argues that Counts One and Two fail to identify the owners of the stolen bonds. James contends that because the bonds at issue are bearer bonds, the owner is presumed to be the holder, and the government was required to identify the legal owners to establish that he was not in lawful possession of the bonds. James' reasoning infers that the conspirators had legal title once they stole the bonds for the simple reason that whoever is in possession of the bonds holds valid title to the bonds! Obviously, this ridiculous argument is without merit. It is not necessary that the true legal owners be produced before the bonds could be considered stolen; "title is not a defense [to a Section 2314 charge] where title and possession are secured as a result of fraud." *United States v. Mucci*, 630 F.2d 737, 741 (10th Cir.1980). Furthermore, Counts One and Two repeatedly allege that the bonds were stolen, and because the stolen bonds had a value in excess of $5,000, this is all that is necessary under *Mosley*, 786 F.2d at 1334.

### B. Sufficiency of the Evidence

■ Defendant James also argues that there was insufficient evidence to establish that the bonds were in fact stolen. His claim is once again based on the fact that the securities involved were bearer bonds

and that the true owners of these bonds were not identified. Since the owners were not identified, James argues that the government did not prove that the bonds were stolen.

A defendant attacking the sufficiency of the evidence has a heavy burden and "[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984) (quoting *Brandom v. United States*, 431 F.2d 1391, 1400 (7th Cir.1970), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971)). Furthermore, all reasonable inferences must be drawn in favor of the government. *United States v. Douglas*, 874 F.2d 1145, 1151 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989). It is interesting to note that the defendant failed to renew his motion for a judgment of acquittal (initially made at the close of the government's case and denied at that time) at the close of trial or within seven days after the verdict pursuant to Federal Rule of Criminal Procedure 29(c). This court has ruled that such a failure to renew a motion for a judgment of acquittal at the close of trial or within seven days after the verdict constitutes a waiver on appeal of any challenge to the sufficiency of the evidence which can be reviewed "only where the defendant demonstrates a manifest miscarriage of justice," *United States v. Berardi*, 675 F.2d 894, 902, n. 16 (7th Cir. 1982), and the defendant has certainly failed this test. Nonetheless, under either standard of review, there was more than sufficient evidence that the bonds were stolen.

Contrary to defendant James' contention that the government can only prove that the bonds were stolen by the testimony of the victims of the thefts, the government may establish the theft through the words or actions of the conspirators. Theft of goods under § 2314 can also be established through circumstantial evidence. *United States v. Neapolitan*, 791 F.2d 489, 502 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986). Circumstantial evidence that the bonds were stolen can be the sole support for the conviction. *United States v. Grier*, 866 F.2d 908 (7th Cir.1989).

Indeed, circumstantial evidence may be used "to demonstrate both a conspiracy and the defendant's participation in the conspiracy." *United States v. Vega*, 860 F.2d 779, 793 (7th Cir.1988) (citing *United States v. Nesbitt*, 852 F.2d 1502, 1510 (7th Cir.1988)). As we observed in *Nesbitt* at 1510:

> " '[I]t is perfectly legitimate to prove a conspiracy by circumstantial evidence.' [*United States v. Griffin*, 827 F.2d 1108, 1116 (7th Cir.1987), *cert. denied* [485 U.S. 909], 108 S.Ct. 1085 [99 L.Ed.2d 243] (1988) ]. By its very nature, a conspiracy 'is conceived and carried out clandestinely, and direct evidence of the crime is rarely available. Thus, circumstantial evidence from which the jury could reasonably infer the existence of an agreement is permissible.' [*United States v. Mayo*, 721 F.2d 1084, 1088 (7th Cir. 1983) ] (quoting *United States v. Washington*, 586 F.2d 1147, 1153 (7th Cir. 1978)). *See also United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir.1986) ('Circumstantial evidence is of equal probative value to direct evidence')."

In this case, the evidence of theft was corroborated by overwhelming evidence of a scheme to sell stolen securities carried out by the defendant James and his co-conspirators including: (1) sending the bonds from Arizona to Illinois via Federal Express; (2) coded phone conversation; (3) selling the bonds in smaller sets in order to deflect suspicion; (4) selling the bonds at different locations using different sellers in order to deflect suspicion; and (5) division of the proceeds from the sales of the bonds which paid a set percentage to Ange, Harrod, defendant James, Ange's nephew suppliers in New York, and Harrod's recruits, Hellinger and Beyer. In addition to this evidence, the defendant testified that he knew that the first set of bonds was stolen at the time he sent the bonds to Harrod.

He also admitted that he knew the second set of bonds was also stolen at the time he forwarded them to Harrod.[7]

Defendant James' argument that there was insufficient evidence to convict him because the owners of the securities were not identified is likewise without merit.

"It is well settled that an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy ... In charging such a conspiracy 'certainty to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is necessary.'"

*Wong Tai v. United States*, 273 U.S. 77, 81, 47 S.Ct. 300, 301, 71 L.Ed. 545 (1927) (citing *Williamson v. United States*, 207 U.S. 425, 447, 28 S.Ct. 163, 170–71, 52 L.Ed. 278 (1908)). The six North Carolina Municipal Power Agency bonds which formed the basis of Count Two against James had been kept in a restricted access vault at Manufacturers Hanover Trust in New York City. John Peters of Manufacturers Hanover Trust testified at trial that during a routine audit of the vault it was determined that five $5,000 North Carolina Municipal Power Agency bonds had "mysteriously disappear[ed]" between August 6 and October 1, 1984. Harrod testified that James sent him a set of five $5,000 bonds in late August 1984, and Harrod in turn gave these bonds to Beyer to cash, and Harrod later sent James a share of the proceeds from the sale of these bonds. The serial numbers of the missing bonds from the Manufacturers Hanover Trust vault matched the serial numbers of the bonds cashed by Beyer at the Prudential-Bache office in Olympia Fields, Illinois, on August 30, 1984.

The "unexplained disappearance of carefully handled, closely guarded documents suffices to support an inference of theft." *United States v. Izzi*, 427 F.2d 293, 297 (2d Cir.), *cert. denied*, 399 U.S. 928, 90 S.Ct. 2244, 26 L.Ed.2d 794 (1970) (citations omitted); *see United States v. McGregor*, 529 F.2d 928, 929–30 (9th Cir.1976) (evidence that coins were missing under mysterious circumstances and that records of the transfer were not found was sufficient to support inference of theft under section 2314); *see also Lake v. United States*, 375 F.2d 442 (9th Cir.1967) (evidence that an item was present during the taking of the inventory in May in a closely controlled area but missing in the following June inventory was sufficient to support inference of theft under section 2314). The evidence that the five North Carolina Municipal Agency bonds mysteriously disappeared and were subsequently cashed by Harrod was more than sufficient to support an inference of theft finding by the jury. "An appellate court may overturn a jury verdict only if the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Wiehoff*, 748 F.2d 1158, 1160–61 (7th Cir.1984) (citations omitted). Furthermore, "[g]iven the exceedingly narrow role of an appellate court in reviewing a decision of the jury, it cannot be said that there is not sufficient circumstantial evidence from which a jury could rationally infer that the [bonds] were in fact stolen." *United States v. Neapolitan*, 791 F.2d 489, 503 (7th Cir.1986) (citations omitted). Our review of the evidence dealing with the missing bonds leaves this court with no doubt that the bonds were indeed stolen.

## C. Jury Instruction

Defendant James argues that the jury conspiracy instruction failed to articulate sufficiently that an agreement is a neces-

---

7. James argues that the evidence relating to the first two sets of bonds is not relevant because they were not charged in the indictment. However, the indictment charged a conspiracy beginning "in or about May 1984 and continuing until in or about April 1985...." The first set of bonds was negotiated on May 18, 1984; this is during the time period charged in the indictment. Furthermore, the check received for cashing the second set of bonds was listed as one of the overt acts in the indictment.

sary element of a conspiracy, and that the instructions' reference to an "unlawful purpose" was vague. When considering the sufficiency of jury instructions, "[i]t is axiomatic that in determining the propriety of the instructions, they are to be viewed as a whole.... As long as the instructions treat the issues fairly and adequately they will not be interfered with on appeal." *United States v. Machi*, 811 F.2d 991, 1005 (7th Cir.1987) (quoting *United States v. Patrick*, 542 F.2d 381, 389 (7th Cir.1976)).

■ James argues that the Seventh Circuit Pattern Jury Instruction 5.11 (1980) does not allege the agreement necessary for conspiracy.[8] However, the jury instruction specifically referred to the required "agreement," and we agree with the trial judge's statement that this instruction is a proper and accurate statement of conspiracy law.

■ James also contends that the phrase "unlawful purpose" in the jury instruction could have led the jurors to consider other acts not charged in the indictment or allegations in the indictment which were not supported by evidence at trial. This contention, like the previous one, nit-picks and focuses on two specific words in the jury charge taken out of context rather than reading and considering the jury charge as a whole. "In determining the propriety of instructions they are to be viewed as a whole, and as long as the instructions treat the issues fairly and adequately they will not be interfered with on appeal." *United States v. Ray*, 683 F.2d 1116, 1127 (7th Cir.), *cert. denied*, 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1982). Reading the instruction as a whole, it is clear that "unlawful purpose" refers to the indictment. This court recently held that this same instruction (Seventh Circuit Pattern Jury Instruction 5.11) makes "it clear that the jury could convict a defendant only if it found, as an initial matter, that the government had established the existence of the alleged [conspiracy]...." *United States v. Briscoe*, 896 F.2d 1476, 1514 (7th Cir.1990). The trial court instructed the jury that James was "charged in Count One of the indictment with conspiracy to transport in interstate commerce and to sell stolen bonds." Moreover, a copy of the indictment was provided to the jury during deliberations. Thus, the instructions when read in their entirety were sufficient to apprise a reasonably intelligent juror of the charged conspiracy's alleged "unlawful purpose."

### D. Sentence Imposed

■ As his final argument, James invokes the time-worn contention that he was subject to a harsher sentence than his co-defendants who pled guilty simply because he exercised his right to a jury trial. Defendant James and three of his co-conspirators who pled guilty, Harrod, Beyer and Hellinger, were all sentenced under the pre-Guidelines. Our review is limited. *Dorszynski v. United States*, 418 U.S. 424, 431, 94 S.Ct. 3042, 3047, 41 L.Ed.2d 855 (1974). "Indeed, we will not disturb such a sentence imposed within the statutory limits unless the trial court, in exercising its discretion, relied on improper or unreliable information or did not exercise any discretion at all." *United States v. Dougherty*, 895 F.2d 399, 405 (7th Cir.1990) (citations omitted).

Defendant James' argument that the three co-conspirators who pled guilty received lighter sentences is insufficient as a

---

**8.** The relevant part of the instruction defining conspiracy reads:

"In order to establish the offense of conspiracy, the government must prove these elements beyond a reasonable doubt:

(1) that the alleged conspiracy existed,

(2) that an overt act was committed in furtherance of the conspiracy, and

(3) that the defendant knowingly and intentionally became a member of the conspiracy.

A conspiracy is a combination of two or more persons to accomplish an unlawful purpose. A conspiracy may be established even if its purpose was not accomplished.

In determining whether the alleged conspiracy existed, you may consider the actions and statements of the alleged participants. The agreement may be inferred from all the circumstances and the conduct of the alleged participants."

matter of law.[9] "This court has held repeatedly that the mere fact that a defendant who proceeded to trial received a heavier sentence than did a co-defendant who pleaded guilty does not establish an abuse of the trial court's discretion." *United States v. Fields*, 689 F.2d 122, 128 (7th Cir.), *cert. denied*, 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 935 (1982).

The record contains no evidence supporting James' contention that he was given a harsher sentence resulting from his plea of not guilty and requesting a trial by jury. The trial judge presented reasonable and valid reasons for the sentence she imposed upon the defendant James. The court considered James' "pivotal role" in the setting up of the conspiracy and the "substantial amount of stolen bonds" he was involved with. The trial judge also found his testimony to be "less than candid" and "very difficult to believe." In contrast to James, Beyer, Hellinger and Harrod, all agreed as part of their plea agreements to cooperate fully with the government in this investigation (Harrod eventually became the government's key witness at James' trial). Moreover, the trial court determined that Beyer and Hellinger played minimal roles in this conspiracy because they were only acting as agents for the main conspirators, James, Harrod and Ange. Finally, the two-year prison term James received for Count One of the indictment, as well as the five-year probationary term for Count Two, fell far short of the statutory maximum for these offenses.[10] Thus, we are of the opinion that the district court did not abuse its discretion in sentencing James; he received a period of confinement well-tailored to his role in the conspiracy.

### IV. CONCLUSION

The decision of the district court is AFFIRMED.

**9.** James received a two-year prison sentence and five years on probation to run consecutively. Imposition of sentence on Beyer and Hellinger was suspended, and each received three years' probation due to their minimal roles in the conspiracy. Harrod, who along with defendant James and Ange was a main conspirator, received four years' imprisonment and five years' probation. Harrod's prison term was to run concurrently with an eight-year sentence he was serving for an unrelated conviction while his probation term was to run consecutively to the previous probation sentence. Meanwhile, Ange, who was a fugitive at the time of trial, eventually pled guilty to two counts in the indictment and was sentenced to three years' imprisonment and five years' probation. Thus, James received a lighter sentence than Ange.

**10.** The maximum penalty under 18 U.S.C. § 371 is five years' imprisonment. The maximum sentence for 18 U.S.C. § 2314 is ten years' imprisonment.