**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Shante CROWDER and Herminia Ford, Defendants–Appellants.**

**Nos. 93–1370 and 93–1381.**

United States Court of Appeals, Seventh Circuit.

Argued April 20, 1994.

Decided Sept. 28, 1994.

---

Bennett E. Kaplan (argued), Office of the U.S. Atty., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

Kent R. Carlson (argued), Chicago, IL, for Shante Crowder.

Standish E. Willis, Judith A. Scully (argued), Chicago, IL, for Herminia Ford.

Before BAUER and CUDAHY, Circuit Judges, and GRANT, District Judge.*

GRANT, District Judge.

Defendants Shante Crowder and Herminia Ford were convicted of conspiracy to possess cocaine with intent to distribute and attempt to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(A)(1) and 846. Both appeal their convictions contending that there was insufficient evidence to prove guilt beyond a reasonable doubt. While Ford acknowledges that the evidence may show that she attempted to possess cocaine, she contends that the government failed to prove beyond a reasonable doubt that she knowingly conspired with anyone to distribute it. Crowder admits that she participated in the conspiracy, but contends that her participation was coerced under threat of serious bodily harm. We address each of these arguments in turn.

---

* The Honorable Robert A. Grant, of the United States District for the Northern District of Indiana, is sitting by designation.

## I.  BACKGROUND

### A.  The Conspiracy

From May 1991 to April 6, 1992, Shante Crowder engaged in several conversations with Kooroush Khalaj, a government informant, in which they discussed the purchase of cocaine. Crowder told Khalaj that she was working with a man named Randy, and that if the quality of the cocaine was good, they could do a large volume of business. After several discussions, and one failed attempt, a deal was finally scheduled to take place on April 6, 1992. Pursuant to their agreement, Khalaj and Crowder were to meet in a Walgreen's parking lot where Khalaj was to sell Crowder two kilograms of cocaine for $40,000.00. Crowder informed Khalaj that her sister, Herminia Ford, would accompany her and that Ford would be the one who actually made the purchase.

Prior to the meeting, Crowder and Ford drove to Randy's house where they discussed the transaction with two other men, identified only as Jube and Culpepper. It was agreed that Jube would be in the parking lot when Crowder and Ford arrived, and would signal if he thought it was unsafe to conduct the transaction.

At approximately 4:00 p.m., the two entered the Walgreen's parking lot, circled, and then left when Jube signaled that the deal was not to proceed. According to her post-arrest statement, Crowder thereafter met with Randy, Jube and Culpepper and was instructed to return to the Walgreen's parking lot to meet with Khalaj to discuss an alternate site.

Khalaj and DEA Agent Andre Kellum, who assumed the role of Khalaj's associate, arrived in the parking lot a few minutes after 4:00, and waited for Ford and Crowder to return. Ford and Crowder were subsequently observed in an area near the parking lot. Crowder got out of the car and walked towards a public telephone where she was joined by four men. Ford meanwhile drove into the Walgreen's parking lot and parked

next to Khalaj's car. Khalaj asked where Crowder was and demanded that Ford go and get her. When the two returned a few minutes later, Crowder told Khalaj that she wished to conduct the deal elsewhere and suggested a local Kentucky Fried Chicken restaurant. Crowder told Khalaj that she would be inside the restaurant, and that when he arrived he should point to the car where the cocaine was and Ford would complete the transaction.

When Khalaj and Kellum arrived at the restaurant, they observed Crowder and Ford standing together outside. Crowder walked towards Khalaj's car and Khalaj motioned to Kellum's car. Crowder thereafter met briefly with Ford and pointed in Kellum's direction. Ford then walked to Agent Kellum's car, got in, and had a brief conversation with Kellum. When Kellum asked Ford whether she had the money, Ford opened the black purse which she was carrying. Agent Kellum then asked, "How much is it?" and Ford responded, "It's all in there." When Kellum asked Ford to count the money and told her "it's got to be right," Ford responded, "It's in there." Ford and Crowder were subsequently arrested, and over $40,980.00 was recovered.

### B.  Ford's Defense

Herminia Ford testified in her own behalf at trial. She stated that on April 6, 1992, she traveled from her home in Michigan to Chicago to visit with her family, arriving at Crowder's house in the early afternoon. Ford testified that Crowder seemed upset and asked Ford to take a ride with her to a friend's house, which she did. According to Ford, Crowder asked her to follow her in her friend's car to the Walgreen's parking lot. When she arrived, Khalaj initiated a conversation with her.

Crowder then met with Khalaj, and Crowder and Ford left the parking lot. The two drove to the Kentucky Fried Chicken restaurant. Once there, Crowder told Ford to give a black bag to a man in a car. Ford testified that she did as she was instructed, but did not know what was in the bag. She stated that she was "stunned" when Agent Kellum pulled money from the bag, and that she tried to leave the car, but the doors were locked. Ford testified that she did not know that Crowder was engaged in a cocaine deal.

### C.  Crowder's Defense

Shante Crowder also testified at trial. She stated that she first met Khalaj in 1986 or 1987, when her boyfriend, Louis Casquales, was dealing in drugs. Crowder testified that during that time period, she saw Khalaj at various drug transactions, and that she had a friendly relationship with him.

According to Crowder, however, the relationship between Khalaj and Casquales soured after one transaction in which Khalaj claimed Casquales had failed to pay him $16,000.00. Crowder testified that Khalaj told Casquales that he had to "pay up." Casquales allegedly told Khalaj that he needed time to come up with the money and Khalaj became very angry. One month later, Casquales was found dead of a gunshot wound. Crowder testified that she believed Khalaj might have had something to do with Casquales' death, and that a second associate, Jose Rodriguez, was also murdered in 1988.

Crowder testified that she had a conversation with Khalaj in February or March 1991, in which he demanded that she pay him the money he was owed by Casquales. When she told him she did not have the money, he insisted that she set up a drug deal for him as repayment. Crowder testified that she was nervous and afraid, and told Khalaj that she was not involved with drugs any more. In May 1991, however, Crowder agreed to "hook up something for [Khalaj]." According to Crowder, she made the statement out of fear and thought that Khalaj might thus believe she was trying to find a deal for him, although in reality she was not. In April 1992, however, Crowder told Khalaj that she had found a deal. She thought that if she did not something would happen to her. Crowder indicated that she did not mention her fear of Khalaj in her post-arrest statement because she did not think it was important, but that she set up the deal on April 6, 1992 because she feared for her life. She further stated that absent her fear of being harmed by Khalaj, she would not have participated in the sale of narcotics.

## II. DISCUSSION

### A. Sufficiency of the Evidence: Ford's Conviction

Ford contends that the evidence was insufficient to support her conviction for conspiracy to possess with intent to distribute cocaine. The hurdle she must overcome, however, is formidable. *United States v. Burrell*, 963 F.2d 976, 987 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992). "Our standard of review requires that the evidence be viewed in the light most favorable to the government in determining whether '*any* rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Draiman*, 784 F.2d 248, 251 (7th Cir.1986) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). *See also Burrell*, 963 F.2d at 987. We will not reweigh the evidence or invade the jury's province of assessing credibility, *United States v. Van Wyhe*, 965 F.2d 528, 531 (7th Cir.1992), and we will overturn the jury's verdict "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Brandom v. United States*, 431 F.2d 1391, 1400 (7th Cir.1970), *cert. denied*, 400 U.S. 1022, 401 U.S. 942, 91 S.Ct. 586, 950, 27 L.Ed.2d 634, 28 L.Ed.2d 223 (1971). *See also United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir.1992); *United States v. James*, 923 F.2d 1261, 1267 (7th Cir.1991); *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984).

"To sustain the conspiracy charge against [Ford], the government need only prove the existence of the conspiracy and a participatory link with the defendant[ ]." *United States v. Blas*, 947 F.2d 1320, 1325 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1234, 117 L.Ed.2d 468 (1992) (quoting *United States v. Caudill*, 915 F.2d 294, 297 (7th Cir.1990)). *See also United States v. Auerbach*, 913 F.2d 407, 414–15 (7th Cir. 1990) ("the government must present sufficient evidence to demonstrate that the defendant knew of the conspiracy and that [s]he intended to join and associate h[er]self with

its criminal design and purpose"). Contrary to the defendant's assertion, the government was not required to prove that she joined the group, only the agreement. *United States v. Maholias*, 985 F.2d 869, 874 (7th Cir.1993); *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir.1991). "While we review the record in this case for substantial evidence of [Ford's] involvement in the conspiracy alleged by the government, we accept circumstantial evidence as support, even sole support, for a conviction." *Maholias*, 985 F.2d at 874 (citing *United States v. Durrive*, 902 F.2d 1221, 1229 (7th Cir.1990)).

The existence of a conspiracy to possess and distribute cocaine is not disputed. Ford simply contends that she was an innocent dupe in the transaction, that she had no knowledge of the nature of the transaction or of the intended use of the cocaine, and that the government failed to prove otherwise. We disagree.

"An agreement to conspire is 'typically distinguished by cooperative relationships between the parties that facilitate the achievement of the goal.'" *United States v. Rosalez–Cortez*, 19 F.3d 1210, 1215 (7th Cir. 1994) (quoting *Townsend*, 924 F.2d at 1389–90). Although mere association with, or knowledge of, an existing conspiracy is not enough to show participation in that conspiracy, *United States v. Perlaza*, 818 F.2d 1354, 1359 (7th Cir.), *cert. denied*, 484 U.S. 861, 108 S.Ct. 176, 98 L.Ed.2d 130 (1987), presence or a single act will suffice if circumstances show that the act was intended to advance the ends of the conspiracy. *United States v. Simone*, 931 F.2d 1186, 1192–93 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991); *United States v. Binkley*, 903 F.2d 1130, 1134 (7th Cir.1990). Evidence of even a slight connection between the defendant and the conspiracy will be sufficient to convict. *United States v. Xheka*, 704 F.2d 974, 988 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983).

The connection in Ford's case was more than slight. Ford not only was present during all phases of the transaction, but actively participated in the culmination of the

sale, thus advancing the ends of the conspiracy. That she had knowledge of the ultimate goal of the conspiracy is demonstrated not only by her presence during conversations concerning the transaction, but by the amount and value of the cocaine which she sought to purchase. *See United States v. Gonzales,* 933 F.2d 417, 427 (7th Cir.1991).

While a great deal of the evidence in Ford's case is circumstantial, the jury could have reasonably inferred that Ford knowingly agreed to join Crowder and her co-conspirators and to assist them in purchasing cocaine which she knew was ultimately intended for distribution. The jury was adequately instructed with respect to mere presence and mere association, and found that Ford was not what she professed to be, an innocent dupe, but rather was an active participant in the conspiracy. The evidence amply supports that determination. *See Rosalez–Cortez,* 19 F.3d at 1216; *Burrell,* 963 F.2d at 988; *United States v. Jones,* 950 F.2d 1309, 1313 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1700, 118 L.Ed.2d 410 (1992). While Ford may not have had any knowledge of the conspiracy prior to April 6, 1992, her actions on that date clearly demonstrated that she was informed as to the purpose of the conspiracy when she knowingly assisted her sister in culminating the sale.

### B. Crowder's Coercion Defense

■■■ Our role as a reviewing court is indeed limited when the credibility of a witness is at issue. Absent extraordinary circumstances, we cannot and will not "reevaluate the testimony of a witness to determine his or her motives or other possible measures of reliability." *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989). *See also United States v. Blas,* 947 F.2d 1320, 1325 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1234, 117 L.Ed.2d 468 (1992); *United States v. Beverly,* 913 F.2d 337, 360 (7th Cir.1990); *United States v. Garner,* 837 F.2d 1404, 1423 (7th Cir.1987), *cert. denied,* 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988). "Even when a conviction rests

upon the uncorroborated testimony of an accomplice, the verdict will be upheld unless the testimony is incredible as a matter of law."[1] *United States v. Hernandez,* 13 F.3d 248, 252 (7th Cir.1994). *See also Van Wyhe,* 965 F.2d at 531; *Blas,* 947 F.2d at 1325; *Dunigan,* 884 F.2d at 1013.

■■■ As the proponent of the coercion defense, Crowder was required to show that she reasonably feared immediate death or serious bodily harm unless she committed the criminal act with which she was charged, and that there was no reasonable opportunity to refuse to commit the offense and to avoid the threatened injury. *United States v. Bailey,* 444 U.S. 394, 410, 100 S.Ct. 624, 634–35, 62 L.Ed.2d 575 (1980); *United States v. Toney,* 27 F.3d 1245, 1248, 1252 (7th Cir.1994); *United States v. Tanner,* 941 F.2d 574, 587 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 432 (1992); *United States v. Patrick,* 542 F.2d 381, 386–87 (7th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977). Crowder took the stand in her own behalf at trial in an effort to convince the jury that her participation in the conspiracy was not voluntary, but rather the result of coercion. The government was thus required to disprove coercion beyond a reasonable doubt. *Bailey,* 444 U.S. at 412–13, 100 S.Ct. at 635–36; *Toney,* 27 F.3d at 1248, 1252. It could do so by either "proving that the defendant's fear or perception of serious bodily harm was unreasonable" or "by proving that the defendant had a reasonable opportunity to avoid the offense." *Toney,* 27 F.3d at 1252. In Crowder's case, it did both.

■■■ Crowder's version of the events did not go unchallenged. Khalaj took the stand during the government's case and testified under oath that he first met Crowder on May 29, 1991; that he had never seen her before that time; and that he did not know Louis Casquales. The jury found Khalaj's testimony to be the more credible of the two. That determination is not surprising. Following

---

**1.** "To be incredible as a matter of law, a witness' testimony must be unbelievable on its face. In other words, it must have been either physically impossible for the witness to observe that which he or she claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *Dunigan,* 884 F.2d at 1013.

her arrest, Crowder gave a detailed and extensive post-arrest statement, but made no mention whatsoever that Khalaj had been threatening her or that she committed the crime under duress or coercion. During the trial, the jury heard six tape recorded conversations between Crowder and Khalaj. None of these tapes contain any mention or reference to Crowder's former boyfriend, a debt owed by Crowder to Khalaj, or a threat by Khalaj to Crowder. The jury found on the basis of this evidence that Crowder was not the victim of coercion, and that the government had proven beyond a reasonable doubt that she knowingly and intentionally conspired to possess and distribute cocaine on April 6, 1992. Absent extraordinary circumstances, which are not present here, their verdict must be affirmed. *Blas,* 947 F.2d at 1325; *Beverly,* 913 F.2d at 360; *Dunigan,* 884 F.2d at 1013; *Garner,* 837 F.2d at 1423.

#### C. Admission of the Tape Transcripts

As one final note, Ford contends that the district court erred when it allowed transcripts of the taped conversations between Crowder and Khalaj to be used during jury deliberations. She contends that the proper procedure where the parties disagree as to the content of the tape, is for the jury to receive transcripts of both side's versions, *United States v. Bryant,* 480 F.2d 785 (2d Cir.1973); *United States v. Carson,* 464 F.2d 424 (2d Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972), and that this procedure was not followed in the present case. The flaw in Ford's argument is obvious—the parties in this case did *not* disagree as to the content of the tapes or transcripts. There was no objection to the legitimacy or accuracy of the transcripts when they were initially published to the jury during the course of the trial, and no "defendant's version" of the tape recordings was proffered.

The decision to allow the transcripts to be used during deliberations is committed to the sound discretion of the district court. *United States v. Camargo,* 908 F.2d 179, 183 (7th Cir.1990); *United States v. Doerr,* 886 F.2d 944, 966 (7th Cir.1989). The district court found that the transcripts would aid the jury in reviewing the tape recordings and allowed them to be used during deliberations. The jury was also provided with a written instruction as to the limited use to be made of the transcripts. We approved of this practice in *Camargo,* 908 F.2d at 183, *Doerr,* 886 F.2d at 966, and *United States v. Puerta Restrepo,* 814 F.2d 1236, 1242 (7th Cir.1987), and the defendant has asserted no factual or legal basis for rejecting it in the present case.

### III.   CONCLUSION

Viewing the evidence in a light most favorable to the government, we conclude that there was indeed sufficient evidence from which a jury could have found the defendants guilty beyond a reasonable doubt. Accordingly, the convictions are

A<small>FFIRMED</small>.