**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Manuel MARQUEZ, Defendant–
Appellant.**

No. 94–2246.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 13, 1994.

Decided Feb. 14, 1995.

Barry Rand Elden, Asst. U.S. Atty., John J. Tharp, Jr. (argued), Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee U.S.

Standish E. Willis, Chicago, IL (argued), for defendant-appellant Manuel Marquez.

Before CUDAHY, FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Manuel Marquez was convicted by a jury of conspiring to produce false identification documents, aiding and abetting the transfer of counterfeit alien registration cards, and possessing with intent to unlawfully transfer counterfeit alien registration cards, in violation of 18 U.S.C. §§ 2, 371, and 1028. The district court sentenced Marquez to twenty-one months imprisonment and a fine of $4,000. On appeal, Marquez challenges the sufficiency of the evidence to support his conviction, and the district court's application of a six-point sentencing enhancement for his involvement with more than 100 counterfeit documents. We affirm Marquez's conviction and sentence.

## I.

On January 30, 1993, undercover agents of the Immigration and Naturalization Service ("INS") met with Jesus Avila–Medina ("Avila") at Avila's residence to purchase a counterfeit alien registration card and a counterfeit social security card. The agents had purchased counterfeit documents from Avila about six months earlier, but this time Avila told them that he had switched to a source that prepared better quality cards. The agents gave Avila a photograph to use along with certain biographical information and paid him $160.

Avila then asked the agents to drive him to his source to place the order for the documents. The agents drove Avila to a residence where defendant Manuel Marquez and his cousin Jose Marquez lived. After Avila dropped off the materials, the agents took him back to his apartment.

Several hours later, Manuel Marquez appeared at Avila's apartment. Marquez stayed for only a few minutes and then drove back to his residence. Shortly after Marquez left Avila's apartment, the INS agents picked up the counterfeit documents they had ordered. Between the time when the agents brought Avila back to his apartment and the time when the agents picked up the counterfeit documents, only Manuel Marquez was observed visiting Avila's apartment building.

Two days later, on February 1, 1993, the INS agents met with Avila at 1:00 p.m. to purchase another set of counterfeit documents. With the agents looking on, Avila dialed Manuel Marquez's home telephone number. Nobody answered at the other end, and the agents left. About 2:30 p.m., Jose Marquez arrived at Avila's apartment and quickly departed. When the agents returned at about 3:00 p.m., Avila told the agents that "they"—referring to his source—had picked up the photos for the cards already, but had not yet returned with the finished products. The agents returned again at 4:30 p.m., but the cards still had not been delivered.

Jose Marquez stopped by Avila's apartment between 6:00 p.m. and 6:30 p.m., and left less than a minute later. When the agents returned to the apartment for the third time, Avila told them that the cards had not yet been delivered. As the agents prepared to leave, however, Avila checked under the mat outside his front door and found the counterfeit cards.

The INS agents subsequently arrested Avila and Jose Marquez, who was carrying $70 of the $150 that the agents had paid to Avila earlier in the day (the serial numbers of the funds used by the agents had been recorded). Later, during a search of Manuel Marquez's residence pursuant to a warrant, INS agents discovered in a small bedroom 334 counterfeit alien registration and social security cards, laminating equipment, several typewriters, and other materials used to produce counterfeit identification documents. Manuel Marquez, who was present during the search, told the agents that the bedroom was used by his cousin, Jose Marquez. The door to the bedroom was open when the agents arrived.

In the kitchen adjacent to the bedroom was a hutch in which agents found numerous documents: a blank counterfeit alien registration card; several envelopes addressed to Manuel Marquez; another envelope containing certain biographical information; and a blank envelope containing a photograph of a young female. One of the envelopes contained a note asking "Manuel" to send the papers, including a social security card, to an address in South Carolina. When an agent

questioned Marquez about the note, he said that he did not know anything about it.

At trial, Marquez denied any involvement in the production or distribution of counterfeit immigration documents. He testified that he "never" entered the bedroom used by his cousin where most of the evidence was recovered, and that the door to the bedroom was closed "all the time." He further testified that the envelopes and other materials found in the kitchen hutch belonged to his cousin Jose, even though they were addressed to Manuel Marquez. Marquez explained that several months before Jose moved in with him in September or October 1992, Jose informed him that he was having some mail sent to Manuel's address in Manuel's name. According to Manuel Marquez, Jose was concerned that letters addressed to Jose himself had been getting lost in the mail and that Manuel's landlord might not know what to do with letters addressed to "Jose Marquez."

On March 3, 1993, a grand jury indicted Manuel Marquez on three charges. Count One charged that Manuel Marquez conspired with Avila and Jose Marquez to produce and traffic in counterfeit identification documents, specifically alien registration cards and social security cards, in violation of 18 U.S.C. § 371 and 18 U.S.C. § 2. Count Two charged that Marquez aided and abetted the distribution of a counterfeit alien registration card by Avila, in violation of 18 U.S.C. § 1028(a)(2) and 18 U.S.C. § 2. Count Four charged Marquez with possession with intent to use and transfer unlawfully five or more counterfeit alien registration cards, in violation of 18 U.S.C. § 1028(a)(3).

A jury convicted Marquez of each charge. The district court subsequently sentenced Marquez to twenty-one months imprisonment. In applying a six-point enhancement under the United States Sentencing Guidelines, U.S.S.G. § 2L2.1(b)(2)(c), the court concluded that it was reasonably foreseeable to Manuel Marquez that Jose Marquez possessed all of the counterfeit documents found in his bedroom. The court also fined Marquez $4,000. Marquez timely appealed.

## II.

### A. Sufficiency of the Evidence

Marquez argues that the evidence produced by the government to show that he conspired with others to produce false identification documents was insufficient to support his conviction. Specifically, he contends that there was no "overall agreement" between himself and other members of the conspiracy to produce or distribute counterfeit documents.

Marquez faces a formidable hurdle in challenging the sufficiency of the evidence regarding his participation in a conspiracy. *United States v. Crowder*, 36 F.3d 691, 695 (7th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1146, 130 L.Ed.2d 1105 (1995). In evaluating a challenge to the sufficiency of the evidence, we review the record in the light most favorable to the government, granting it the benefit of any reasonable inferences that may be drawn from the evidence. *United States v. James*, 40 F.3d 850, 860 (7th Cir.1994), *cert. denied sub nom., Williams v. United States*, — U.S. —, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995), & *cert. denied*, — U.S. —, 115 S.Ct. 1160, 130 L.Ed.2d 1116 (1995). If this court finds that any rational jury could have found the defendant guilty, the conviction will be affirmed. *United States v. Cooper*, 39 F.3d 167, 171 (7th Cir.1994). In conducting our review, we will not reweigh the evidence or evaluate witness credibility. *Id.*

To sustain the conspiracy charge against Marquez, the government need only prove Marquez's participatory link to the conspiracy. *Crowder*, 36 F.3d at 695. The government must present substantial evidence that Marquez knew about the illegal objective of the conspiracy and agreed to participate. *James*, 40 F.3d at 861. We will accept circumstantial evidence as support, even sole support, for a conviction. *Crowder*, 36 F.3d at 695.

The record contains sufficient evidence for the jury to infer that Marquez knowingly agreed to join Avila and Jose Marquez and to assist them in their production of counterfeit identification documents. The evidence showed that when Avila took the undercover agents to his source to obtain

counterfeit documents on January 30, 1993, he took them to Manuel Marquez's residence. Approximately two hours later, at about the time delivery of the counterfeit cards was expected, Manuel Marquez appeared at Avila's apartment. Although INS agents maintained surveillance of Avila's residence throughout much of the day, the agents never spotted Jose Marquez—the only other possible source of the counterfeit cards.

The record also reveals that inside one of the envelopes found in the kitchen was a letter addressed specifically to "Manuel," requesting that he send certain social security documents to a location in South Carolina. Significantly, this letter was found in the common kitchen area, and not in Jose's bedroom which Manuel testified he never entered. Moreover, although Manuel testified about Jose's reasons for having his mail sent to Manuel Marquez's address in Manuel's name, this testimony does not explain why the letter inside the envelope was addressed to "Manuel," and not "Jose." From this letter, together with the envelopes, the blank green card, and the photograph—which were all found in the kitchen hutch—the jury could reasonably infer that Manuel Marquez was a source of counterfeit immigration documents.

Thus, sufficient evidence supports Marquez's conspiracy conviction. A reasonable jury could have concluded that Manuel Marquez was working with Jesus Avila and Jose Marquez to produce and distribute counterfeit immigration documents.

## B. Sentencing Enhancement

■ Marquez also challenges the district court's application of a six-point sentencing enhancement for his involvement with the more than 300 counterfeit documents found in the bedroom occupied by Jose. Marquez argues that he was not involved in the activities of Jose Marquez "to any degree such that he would foreseen [sic] the production or distribution of any counterfeit documents."

Section 1B1.3(a)(1)(B) of the Sentencing Guidelines provides that "in the case of a jointly undertaken criminal activity ..., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" are relevant to the determination of a defendant's base level offense. U.S.S.G. § 1B1.3(a)(1)(B) (Nov.1992). " '[T]he most relevant factor in determining the reasonable foreseeability of conduct engaged in by co-conspirators ... is the scope of the defendant's agreement with the other conspirators.' " James, 40 F.3d at 870 (quoting United States v. Edwards, 945 F.2d 1387, 1392 (7th Cir.1991)). " '[R]easonable foreseeability means more than subjective awareness on the part of the individual defendants.... Instead, conduct of co-conspirators ... can be considered "reasonably foreseeable" to a particular defendant if that defendant has demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or his conduct.' " United States v. Zarnes, 33 F.3d 1454, 1474 (7th Cir.1994) (quoting Edwards, 945 F.2d at 1393–94).

A district court's findings of fact at sentencing are reviewed for clear error, and its interpretation of a statute and the Sentencing Guidelines are reviewed de novo. United States v. Young, 34 F.3d 500, 504 (7th Cir. 1994). We will reverse only if, after reviewing all of the evidence, "we are convinced that a mistake has been committed." Zarnes, 33 F.3d at 1474.

The district court found that Marquez could reasonably have foreseen that the conspiracy would involve the 334 counterfeit documents found in Jose Marquez's bedroom. Contrary to Manuel Marquez's assertions, the district judge did explain why Marquez was substantially involved in the production of counterfeit documents. The judge made the following findings: (1) that counterfeit documents were found in Marquez's home, specifically a bedroom that was allegedly used by Jose Marquez; (2) that a note existed which was addressed to Manuel Marquez placing an order for counterfeit documents; (3) that given both the note requesting counterfeit documents as well as the 334 documents found in the home, it was "more probable than not" that Marquez was "actually aware of the documents, and, at the least, that the quantity of documents was reasonably foreseeable to him." United States v. Marquez, No. 93 CR 79–3 (N.D.Ill. May 13, 1994). Based on these findings, the district

judge properly enhanced the offense level by six levels pursuant to U.S.S.G. § 2L2.1. The trial judge's statements of reasons illustrate that he had considered the evidence of Marquez's participation in a conspiracy of the scope alleged by the government.

Marquez does not challenge the express findings made by the district judge, nor has he articulated any basis for asserting that he joined a narrower conspiracy. Accordingly, we decline to disturb the district court's determination that Marquez had an extensive role in the conspiracy such that he could reasonably have foreseen the existence of 334 counterfeit documents in his home.

For the foregoing reasons, we AFFIRM the conviction and sentence of defendant Manuel Marquez.