**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Otha DENNIS and James Brown, a/k/a Donald Ray Washington, Defendants–Appellants.**

Nos. 96–1961, 96–2076.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1996.

Decided June 11, 1997.

Lawrence S. Beaumont (argued), Office of the United States Attorney, Urbana Division, Urbana, IL, for Plaintiff-Appellee.

Thomas A. Bruno (argued), Bruno & Associates, Urbana, IL, for Defendant-Appellant Otha Dennis.

Anthony Novak, Urbana, IL, Kristin R. Solberg (argued), Novak & Associates, Urbana, IL, for Defendant-Appellant James Brown aka Donald R. Washington.

Before WOOD, Jr., RIPPLE and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Defendants Otha Dennis ("Dennis") and James Brown, a/k/a Donald Ray Washington ("Washington"), appeal from their convictions for attempting to possess cocaine with intent to distribute it. Washington and Dennis raise several issues. Both defendants challenge as invalid an anticipatory search warrant authorizing the search of Dennis's apartment after a controlled delivery of an Express Mail package containing cocaine. Dennis also contends that the initial warrantless seizure of the Express Mail package violated his Fourth Amendment rights and that the government's pre-trial discovery rule violations warrant a new trial. Washington, meanwhile, contends that the government presented insufficient evidence to support the guilty verdict against him. We affirm the defendants' convictions on all grounds.

## I. Background

On August 10, 1995, a United States postal inspector determined that an Express Mail package mailed from Los Angeles and addressed to "Otha Dennies" at Dennis's residence in Decatur, Illinois matched a narcotics package profile developed by the United States Postal Service. The inspector detained the package and had a trained drug detection dog sniff the package. After the dog signaled that narcotics were in the package, the inspector obtained a search warrant and opened the package. In addition to miscellaneous personal items, the inspector found approximately 16 ounces of cocaine. The inspector replaced a portion of the cocaine, attached an electronic beeper to the inside of the package, resealed the package and obtained an anticipatory search warrant for the residence to which the package was addressed.

On the next day, the postal inspector, dressed as a mail carrier, delivered the package. When the inspector arrived at the Decatur address, he encountered Dennis and Washington sitting on the front porch. After the inspector announced that he had an Express Mail package for Dennis, Dennis signed for the package and placed it on the corner of the porch. After surveying the area, Dennis picked up the package, and he and Washington went into the first floor apartment. After the defendants entered the apartment, the electronic beeper inside the package sounded, signaling that someone had opened the package.

The police entered the first floor apartment to execute the search warrant and apprehended Dennis in the bathroom while he was attempting to flush down the toilet a pair of socks that had been in the box. The police also found a tennis shoe next to the toilet. The cocaine had been hidden in socks stuffed in one of a pair of tennis shoes in the box. The police found a piece of paper containing the tracking number of the Express Mail package in Dennis's wallet. In addition to these items, the police recovered baggies from the apartment. However, the police did not discover any other narcotics or indicia of narcotics trafficking, such as scales or cash, inside the residence. The police apprehended Washington as he attempted to flee from the apartment. When they stopped Washington, he identified himself as "James Brown" and produced a false California I.D. listing his residence as the same address used as the return address on the package. At the time of his arrest, Washington also had several business cards from Los Angeles and a piece of paper containing Dennis's address in his wallet.

Washington and Dennis were indicted on one count of attempt to possess cocaine with intent to distribute in violation of 21 U.S.C. sec.sec. 841 and 846. After the district court

denied two motions to suppress, the district court severed the defendants' cases for trial. At separate jury trials, Washington and Dennis were convicted, and the district court sentenced each defendant to seventy-eight months imprisonment and three years supervised release.

## II. Discussion

### A. Anticipatory Search Warrant

After discovering the cocaine in the Express Mail package but before delivering the package, the postal inspector obtained an anticipatory warrant to search the residence to which the package had been addressed. In the warrant application and supporting affidavit, the inspector stated that he discovered the package in the mail on its way to the residence to be searched and that he would perform a controlled delivery of the package before authorities executed the warrant. Additionally, because the residence to which the package was addressed was a two-story house consisting of two independent apartments, the warrant application and affidavit sought permission to search one of the apartments. However, . the application sought permission to determine which apartment would be searched at the time of the controlled delivery, based upon who accepted the package and into which apartment it was taken. Specifically, the affidavit requested:

> ... permission to search the first floor apartment *if and only if* an occupant of that apartment accepts delivery or opens the package or the second floor apartment *if and only if* an occupant of the second floor accepts delivery or opens the package.

Based upon this affidavit and application, the district court issued an anticipatory search warrant. Washington and Dennis contend that the warrant was invalid for two reasons. First, they argue that it neither specified the conditions precedent to execution on its face, nor attached the warrant affidavit containing those conditions to the warrant. Second, they contend that the warrant was not supported by probable cause because no independent nexus between the package and the defendants or the place to be searched existed.

We review legal determinations concerning the validity of a warrant and probable cause determinations *de novo. Ornelas v. United States,* —— U.S. ——, ——, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996); *United States v. Leidner,* 99 F.3d 1423, 1425 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1434, 137 L.Ed.2d 542 (1997); *United States v. Adames,* 56 F.3d 737 (7th Cir.1995).

### 1. Conditions Precedent

Anticipatory warrants differ from other search warrants in that they are not supported by probable cause to believe that contraband exists at the premises to be searched at the time they are issued. In fact, a court issues an anticipatory warrant with the knowledge that contraband does not presently exist at the location to be searched. *See Leidner,* 99 F.3d at 1425. However, at the time a court issues an anticipatory warrant, probable cause exists to believe that contraband will be located at the premises to be searched after certain events transpire. *Id.* Thus, conditions precedent to the execution of an anticipatory warrant are integral to its validity. As the Second Circuit explained, probable cause to uphold an anticipatory search warrant exists when a government official presents independent evidence indicating that delivery of contraband will, or is likely to, occur and when the magistrate conditions the warrant on that delivery. *United States v. Garcia,* 882 F.2d 699, 702 (2d Cir.1989). In *Garcia,* a seminal case on anticipatory warrants, the court also recognized that warrants conditioned on future events present some potential for abuse. As such, the court cautioned that a magistrate issuing an anticipatory warrant should protect against premature execution "by listing in the warrant the conditions governing the execution which are explicit, clear, and narrowly drawn so as to avoid misunderstanding or manipulation by government agents." *Id.* at 703–04.

Washington and Dennis contend that this cautionary language obligates the district court to list all conditions precedent to the execution of an anticipatory warrant on

the face of the warrant and that the anticipatory warrant issued in this case is invalid because it failed to list these conditions on its face. However, the Second Circuit has expressly rejected this argument. *United States v. Moetamedi*, 46 F.3d 225, 228–29 (2d Cir.1995). In *Moetamedi*, the court held that an anticipatory warrant need not state on its face the conditions precedent for its execution if the warrant affidavit contains "clear, explicit and narrowly drawn" conditions and the executing officers actually satisfy those conditions before executing the warrant. *Id.* at 229. The court reasoned that conditions precedent need not appear on the face of a warrant itself because the affidavit containing the conditions also will contain a sworn representation that the warrant will not be executed until the package is delivered and accepted. *Id.* (citing *United States v. Tagbering*, 985 F.2d 946, 950 (8th Cir.1993)). Even though a copy of the warrant affidavit was not attached to the warrant at issue in *Moetamedi*, the court upheld the warrant because the affidavit contained satisfactory conditions, the issuing magistrate accepted those conditions and the officers executing the warrant satisfied those conditions. *Id.*

We see no reason to depart from the Second Circuit's interpretation of its own language. Indeed, our reasoning in an analogous Fourth Amendment case compels the same result. In *United States v. Jones*, 54 F.3d 1285, 1290–92 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 263, 133 L.Ed.2d 186 (1995), we held that an affidavit supplying the requisite specificity needed to uphold a challenged warrant need not be physically appended to the warrant or explicitly incorporated by reference where the magistrate considered the affidavit in issuing the warrant and the officers complied with the affidavit when executing the warrant. In reaching this holding, we recognized that the particularity requirement must be applied in a manner that protects the subject of a search from the potential abuses of a general warrant while recognizing the realistic needs of law enforcement authorities. *Id.* at 1291. We concluded that under the circumstances

of the case, relying on the affidavit to uphold the warrant would serve both those purposes. *Id.* Likewise, anticipatory warrants balance the need to protect the subjects of searches from the abuses of warrantless searches (under the exigent circumstances exception) and the practical needs of law enforcement personnel. *See Leidner*, 99 F.3d at 1425–26. Thus, relying on an affidavit to uphold an anticipatory warrant under circumstances similar to *Jones* would likewise promote the purposes behind the Fourth Amendment.

Here, the warrant application and affidavit contained satisfactory conditions. The face of the warrant stated that execution of the warrant was subject to the conditions stated in the affidavit.[1] This evidences that the issuing judge read and considered the affidavit in issuing the warrant. The record also establishes that the officers complied with the conditions precedent in executing the warrant. For example, the postal inspector testified that the executing officers searched only the first floor apartment and conducted that search after Dennis accepted delivery of the package, Dennis and Washington took the package into the first floor apartment and the electronic beeper in the package sounded, indicating that someone had opened the package inside the apartment. Thus, the anticipatory warrant was valid even though it did not list the conditions precedent to execution on its face or append a copy of the supporting affidavit.

### 2. Nexus

█ As we have previously stated, because the contraband is not presently located at the place to be searched at the time an anticipatory warrant is issued and because probable cause depends on contingent future events, anticipatory warrants present greater potential for abuse than other warrants. Most notably, the government or a third party, acting either intentionally or accidentally, could mail a controlled substance to a residence to create probable cause to search the premises where it otherwise would not exist.

---

1. The anticipatory warrant states:

Note first floor apartment or second floor apartment depending on conditions being met which are expressed in the application.

*Leidner,* 99 F.3d at 1430–31 (Diane P. Wood, J., concurring); *United States v. Rey,* 923 F.2d 1217, 1224–25 (6th Cir.1991) (Keith, J., concurring). Thus, to prevent law enforcement authorities from creating the circumstances which give rise to probable cause to search, the Ninth Circuit held that probable cause to support an anticipatory warrant does not exist unless a sufficient nexus between the parcel and the place to be searched exists. *United States v. Hendricks,* 743 F.2d 653, 654 n. 1, 655 (9th Cir.1984). For example, the *Hendricks* court explained that a showing that the contraband was on a "sure course" to the destination to be searched would demonstrate a sufficient nexus. *Id.* at 655. Other circuits, including this circuit, have adopted this "sure course" requirement. *E.g. Leidner,* 99 F.3d at 1427–28; *United States v. Ricciardelli,* 998 F.2d 8, 12 (1st Cir.1993); *United States v. Dornhofer,* 859 F.2d 1195, 1198 (4th Cir.1988).

■ Washington and Dennis argue that the government failed to establish that the Express Mail package was on a sure course to Dennis's apartment because the government established only that a package containing contraband was mailed to the residence. They reason that that showing is insufficient because the government must establish either some connection between the residence to be searched and the package independent of the government-controlled delivery or some connection between the defendants and the package. We have not decided whether placing a package in the mail satisfies the sure course requirement. However, at least where the anticipatory warrant authorizes a search for and seizure of only the package containing the contraband, some circuits have held that placing contraband in the mail satisfies the sure course requirement. *E.g. Dornhofer,* 859 F.2d at 1198; *United States v. Goodwin,* 854 F.2d 33, 36 (4th Cir.1988); *United States v. Hale,* 784 F.2d 1465, 1468–69 (9th Cir.1986). On the other hand, other circuits have recognized that where a warrant authorizes a search for drug paraphernalia as well as the package containing the contraband, simply discovering that a package has been mailed to the residence to be searched may be insufficient to satisfy probable cause. *Garcia,* 882

F.2d at 704; *United States v. Lawson,* 999 F.2d 985, 988 (6th Cir.1993). These courts reason that authorities must demonstrate some other circumstances indicating that the sender intended the package to arrive at the residence to be searched and intended to send the package to the actual recipient.

Even if we were to adopt the latter approach, the warrant issued in this action would be valid. In both *Garcia* and *Lawson,* the courts upheld the warrants at issue because additional facts in the supporting affidavits gave rise to probable cause to search the residences. For example, in *Garcia* the court noted that someone had provided the drug couriers with the telephone number of the apartment to be searched before police stopped the couriers, that one of the couriers had delivered drugs to the residence in the past and that police had observed at least one person suspected of drug activity enter and leave the residence. 882 F.2d at 704. Likewise, in *Lawson,* the court held that all of the information contained in the affidavit "could reasonably lead a person to believe that an experienced trafficker in narcotics sent the package" and that "it was very likely that the address on the package was the one at which it was intended to arrive." 999 F.2d at 988. In reaching this holding, the court noted that the amount of cocaine in the package—six ounces—was too large an amount to be sent on a whim and that the cocaine had been concealed in an attempt to avoid detection. *Id.*

Here, although Washington and Dennis maintain that the fact that the Express Mail package was mailed to the Decatur residence is the only fact in the supporting affidavit establishing probable cause, additional facts in the supporting affidavit also support a finding of probable cause. For example, the postal inspector testified that based upon his experience and drug trafficking intelligence he knew that *drug traffickers* were likely to use priority and Express Mail to ship narcotics. More importantly, he stated that he found sixteen ounces of cocaine in the package—a quantity of cocaine which like the six ounces in *Lawson* is too great an amount to be sent on a whim. Finally, he stated that investigators had connected Dennis to nar-

cotics activities in the past. Thus, based upon all of the information in the affidavit, the district court could reasonably conclude that an experienced drug trafficker sent the package and that the address on the package was the one at which it was intended to arrive.

Moreover, we recognized in *Leidner* that all types of government-controlled deliveries are more likely to reach their destinations than other types of deliveries and that, consequently, a magistrate may conduct a lesser inquiry into the sure course requirement when a request for an anticipatory warrant is based upon a government-controlled delivery. *Leidner*, 99 F.3d at 1429. Thus, in a case such as this, where nothing in the record indicates that the contraband might not have been delivered to the residence to be searched, simply discovering the package in the mail stream and placing it back into the mail stream to effect a controlled-delivery should satisfy the sure course requirement. *Id.*

In an effort to sidestep this result, Washington and Dennis apparently argue that the government must establish a connection between the searched premises and the contraband which existed prior to the controlled delivery. For example, Dennis suggests a showing that he or one of his agents mailed the package in Los Angeles. However, we implicitly rejected this argument in *Leidner*. 99 F.3d at 1429–30. There, law enforcement authorities discovered 200 pounds of marijuana in a drug courier's car during a traffic stop. The courier then identified the person to whom he was delivering the narcotics and agreed to cooperate in a controlled delivery. *Id.* Authorities obtained an anticipatory search warrant for the residence to which the marijuana was to be delivered, *id.*, and the defendant, the recipient of the marijuana, challenged this warrant, contending that an anticipatory warrant is invalid unless the government demonstrates that the contra-

band was on a sure course to the residence before law enforcement authorities intercepted it. *Id.* at 1429 n. 7. Otherwise, the defendant reasoned, the courier could name anyone in an effort to lessen his punishment. *Id.* at 1429. We construed this as a challenge to the courier's reliability and rejected it, adopting instead a "totality of the circumstances" approach similar to that which the *Lawson* and *Garcia* courts employed. *Id.* at 1429–30. We found that the totality of the circumstances in *Leidner* supported a finding of probable cause. In particular, we noted that authorities had corroborated certain portions of the courier's allegations, that a local officer knew the courier and considered him reliable and that the courier made his statements against his penal interest. *Id.* at 1429–30. As we have stated above, the totality of the circumstances here, likewise, supports a finding of probable cause.[2]

## B. Dennis's Claims

### 1. Warrantless Stop

■ The postal inspector initially detained the Express Mail package and subjected it to a sniff by a drug detection dog because it possessed several characteristics which met the U.S. Postal Service's narcotics package profile and which based upon his own experience were consistent with a package containing narcotics. Dennis contends that this initial warrantless detention violated his Fourth Amendment rights. The Supreme Court has recognized that individuals have a Fourth Amendment right to be free from unreasonable searches and seizures of items they place in the mail. *United States v. Van Leeuwen*, 397 U.S. 249, 251, 90 S.Ct. 1029, 1031, 25 L.Ed.2d 282 (1970). However, if law enforcement authorities possess reasonable suspicion to believe that a package contains contraband, they may detain that package for a reasonable length of time while investigat-

---

2. As Judge Diane P. Wood's concurring opinion in *Leidner* demonstrates, even if we required a preexisting nexus as Washington and Dennis urge, the warrant issued in this case would be valid. In her concurrence, Judge Wood stated that she would require a showing of some preexisting nexus between the contraband and the place to be searched that it is not wholly within

the government's control. 99 F.3d at 1431 (Diane P. Wood, J., concurring). However, she also indicated that an address appearing on the package at the time the authorities intercepted it would satisfy this requirement. *Id.* Here, at the time that the postal authorities discovered the Express Mail package, it was already addressed to the Decatur residence.

ing the package. *Id.* at 252–53, 90 S.Ct. at 1032–33. Thus, we may uphold the detention here if the postal inspector reasonably suspected that the package contained contraband and if the detention lasted for a reasonable duration. *United States v. Mayomi,* 873 F.2d 1049, 1054 (7th Cir.1989).[3]

■ We review a determination of reasonable suspicion *de novo. Ornelas v. United States,* ── U.S. ──, ──, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996). However, we review findings of historical fact for clear error only and give due weight to the inferences that resident judges and local law enforcement officers draw from those facts. *Id.* Here, the postal inspector articulated several factors which aroused his suspicion. He also stated that these factors met some of the elements of the Postal Service's narcotics package profile. Thus, on appeal, both parties rely on the validity or invalidity of the profile in arguing for or against reasonable suspicion. For example, Dennis maintains that the postal authorities lacked reasonable suspicion to detain his package because the profile criteria are too vague and unreliable, while the government asserts that the fact that the Express Mail package met the profile supports a finding of reasonable suspicion.

■ However, the profile itself is irrelevant to a reasonable suspicion determination. The mere fact that certain characteristics that a law enforcement officer observes fit a profile will not establish reasonable suspicion. *United States v. Hanson,* 801 F.2d 757, 762 (5th Cir.1986); *see Reid v. Georgia,* 448 U.S. 438, 440–41, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980) (rejecting appellate court's finding of reasonable suspicion based solely on the fact that the defendant fit a drug courier profile). Likewise, the mere fact that the characteristics which the authorities observe may be set forth in a profile does not detract from the evidentiary significance of those characteristics. *United States v. Sokolow,* 490 U.S. 1, 10, 109 S.Ct. 1581,

1586, 104 L.Ed.2d 1 (1989). Instead, in reviewing a reasonable suspicion determination, we require law enforcement authorities to articulate the specific characteristics exhibited by the person or object to be detained which aroused the authorities' suspicion in the particular case before us, and we determine whether those characteristics would reasonably arouse suspicion under the circumstances presented in the case. *See Sokolow,* 490 U.S. at 10, 109 S.Ct. at 1586; *Hanson,* 801 F.2d at 762, Wayne R. LaFave, *Search and Seizure* § 9.4(e) at 174 (3d ed. 1996).

■ Here, the postal inspector stated that the package aroused his suspicion because it was heavily taped, had been sent from a private person to another private person, had been mailed from Los Angeles, a city known to be a source city for narcotics distribution, and had been mailed from a zip code different than the zip code listed in the return address. The postal inspector explained that based on his five years of experience as a narcotics investigator and based upon the narcotics package profile, these factors were consistent with characteristics of other packages found to contain contraband. For example, he explained that because of its high cost, only about five percent of all Express Mail is personal correspondence and that because of its speed and reliability and because the postal service provides a free telephone tracking service, drug traffickers frequently use the service to send personal correspondence containing contraband. Thus, he concluded that personal correspondence sent via Express Mail is likely to contain contraband. Under these circumstances, the postal inspector's suspicion was reasonable and justified detaining the Express Mail package. *See United States v. Lux,* 905 F.2d 1379 (10th Cir.1990) (finding reasonable suspicion where the package met three unspecified factors in the postal service's narcotics package profile) *aff'g United States v. Hill,* 701 F.Supp. 1522, 1528 n. 5 (D.Kan.1988) (the package's size, shape and

---

**3.** Here, the postal inspector subjected the Express Mail package to a drug dog sniff as well as detaining it. However, exposure to a trained canine does not constitute a search within the meaning of the Fourth Amendment. *United*

*States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983). Thus, only the detention implicated Dennis's Fourth Amendment rights.

destination met the profile, the sender handwrote the label and the sender had an unusual return name/address).

Dennis also contends that the factors which the postal inspector articulated are insufficient to arouse reasonable suspicion because each of the factors is consistent with packages which do not contain contraband. However, in certain circumstances wholly lawful conduct may justify an officer's suspicion that criminal activity is afoot. *Sokolow*, 490 U.S. at 9, 109 S.Ct. at 1586 (quoting *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754); *see, e.g., Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (reasonable suspicion based on "a series of acts, each of them perhaps innocent" but when "viewed together warranted further investigation"). Moreover, circumstances which appear innocent to the outside observer may suggest criminal activity to experienced law enforcement personnel, and in determining whether reasonable suspicion exists, law enforcement authorities may assess these circumstances in light of their experience. *United States v. Cordell*, 723 F.2d 1283, 1285 (7th Cir.1983); *see United States v. Sharpe*, 470 U.S. 675, 682–83 n. 3, 105 S.Ct. 1568, 1573–74 n. 3, 84 L.Ed.2d 605 (1985) ("[T]aken together as appraised by an experienced law enforcement officer, [the articulated factors] provided clear justification to stop the vehicles and pursue a limited investigation."). Here, admittedly, any one of the factors which the postal inspector articulated may be found in innocent mailings as well as packages containing contraband. However, the confluence of all of these factors in a single package when appraised by the postal inspector, an experienced narcotics investigator, amounted to reasonable suspicion that the Express Mail package may have contained contraband and justified the investigatory detention.

At some point in time, however, a detention of mail will extend from a stop to a seizure requiring probable cause to support it rather than mere reasonable suspicion. *See Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1574. Thus, we also must determine whether the inspector detained the package for an unreasonably long period of time before obtaining a search warrant. *Mayomi*, 873 F.2d at 1053–54. Brevity of a detention is an "important factor" in determining whether it may be justified by reasonable suspicion only. *Place*, 462 U.S. at 709, 103 S.Ct. at 2645. However, we may also consider whether the police diligently pursued their investigation. *Id.* Accordingly, in *Mayomi*, we determined that detaining one of the letters at issue for less than one day was a de minimis intrusion that did not implicate the defendant's Fourth Amendment rights and that detaining the remaining two letters for forty-eight hours, over a weekend, so that the inspector could subject them to a canine sniff was brief enough to be sustained by reasonable suspicion. 873 F.2d at 1054.

Here, the record does not clearly reveal when the package was placed in the mail. (A photocopy of the Express Mail label appears to be postmarked August 9, 1995.) However, the record clearly shows that the postal inspector discovered the Express Mail package in the mail and detained it at some time on August 10, 1995. By 6:05 p.m. on that same day, the inspector had completed the canine sniff and obtained a search warrant to open the package. Additionally, the package appears to have been delivered on time, and the record indicates that the postal inspector was diligent in his investigation. Thus, any detention was less than forty-eight hours and lasted only as long as necessary to subject the package to a canine sniff. As such, the postal inspector's reasonable suspicion justified the stop, and the search comported with the standards set forth in *Van Leeuwen*.

### 2. Discovery Rule Violations

In between Dennis's trial and Washington's trial, the government obtained the results of a fingerprint analysis which found both Washington's and Dennis's fingerprints on the outside of the Express Mail package. The government did not learn of these test results until after Dennis's trial. Consequently, the government failed to disclose these results to Dennis before trial but also necessarily did not use this evidence in its

case-in-chief against Dennis.[4] Dennis contends that because the government could have learned about the results using reasonable efforts, its failure to learn about the results and disclose them to Dennis violates its pre-trial discovery requirements under Federal Rule of Criminal Procedure 16. He reasons that because the omission substantially prejudiced him, he is entitled to a new trial. The district court rejected this argument when Dennis raised it in his post trial motions, and so do we.

■■■ Rule 16 provides that a court *may*, but is not required to, impose sanctions against a party who violates its disclosure requirements. *United States v. Jackson*, 51 F.3d 646, 651–52 (7th Cir.1995). Those sanctions are left to the court's discretion, and we will not second guess the court's decision absent abuse of that discretion. *Id.* Thus, a new trial is warranted only if the government violated Rule 16 and the remedy offered by the district court was inadequate to provide the defendant with a fair trial. *Id.; United States v. Mounts*, 35 F.3d 1208, 1217 (7th Cir.1994).

We fail to see how the fingerprint evidence would have helped Dennis, and the government did not use the evidence in its case. Thus, we are uncertain that the government violated Rule 16. However, the government has conceded that it violated the rule. Accordingly, we will analyze whether the district court abused its discretion in refusing to sanction the government. Because neither party learned about the fingerprint evidence until after the trial, the only sanction available to the district court to remedy the violation was a new trial. However, the district court refused to impose this sanction, finding that in light of the "overwhelming" evidence of guilt, the fingerprint evidence would not have affected the outcome of the case. In reaching this holding, the court noted that a videotape entered into evidence showed Dennis receiving the package, putting it down while he surveyed the area to determine if any police officers were present and picking up the package and bringing it into the apartment. The court also referred to testi-

mony that Dennis was attempting to flush the cocaine down the toilet at the time the police apprehended him and to the fact that Dennis's fingerprints were on the box along with Washington's. In light of this evidence, we agree with the district court that the fingerprint evidence would not have affected the outcome of the trial and that, accordingly, Dennis was not prejudiced by the government's failure to disclose it to him. Because Dennis received a fair trial, the district court did not abuse its discretion in refusing to impose sanctions, and a new trial is not warranted.

## C. Washington's Claim

■■■ Washington argues that the government presented insufficient evidence at trial to sustain the guilty verdict against him. In challenging the sufficiency of the evidence, Washington must overcome a formidable hurdle. *United States v. Crowder*, 36 F.3d 691, 695 (7th Cir.1994). We will uphold a conviction if, when viewed in the light most favorable to the government, the evidence establishes that any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt, and we will not overturn a jury's verdict unless the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. *Id.; United States v. Van Wyhe*, 965 F.2d 528, 531 (7th Cir.1992). Moreover, we will not reweigh evidence or judge the credibility of witnesses. *Van Wyhe*, 965 F.2d at 531.

■■■ A jury convicted Washington of attempting to possess cocaine with the intent to distribute it. This charge required the government to prove that Washington acted with specific intent to commit the underlying offense and that Washington took a substantial step towards committing the underlying offense. *United States v. Cea*, 914 F.2d 881, 887 (7th Cir.1990). The government presented evidence that Washington was present when Dennis accepted delivery of the package and accompanied Dennis into the apartment with the package, that Washington at-

---

**4.** Because the government did not obtain the information until the day of trial, the government also refrained from presenting this evidence at Washington's trial.

tempted to flee when the police executed the search warrant and that Washington produced a false I.D. when police apprehended him. Additionally, the false I.D. which Washington produced listed the return address on the package as Washington's address, and at the time of his arrest, Washington had in his wallet business cards from Los Angeles and a piece of paper with Dennis's address written on it. The government introduced all of this into evidence. Finally, Dennis testified that Washington told him that a package with "something sweet" in it was coming to his house and that Washington opened the package after Dennis brought it inside the house. Clearly, a rational jury could find beyond a reasonable doubt that Washington acted with specific intent to possess cocaine with the intent to distribute it and that Washington took a substantial step toward committing this crime based on this evidence.

■■■■■ Washington maintains that Dennis's testimony was "vague, waffling, and constantly impeached" and, therefore, is insufficient to sustain the verdict. (Washington's Br. at 13–14). He reasons that without Dennis's testimony the government presented no evidence from which a jury could find beyond a reasonable doubt that Washington took any substantial step toward possessing cocaine. Even if we were to agree with Washington that the government presented no other sufficient evidence, we may not discount Dennis's testimony. Absent extraordinary circumstances, we cannot reevaluate a witness's testimony to determine its credibility. *Crowder*, 36 F.3d at 696. Thus, even when the defendant's conviction rests on his accomplice's uncorroborated testimony, we must uphold the verdict unless the testimony is incredible as a matter of law. *Id.* A witness's testimony is incredible as a matter of law only if it is unbelievable on its face. *Id.* at n. 1. Testimony is unbelievable on its face if it is physically impossible for the witness to observe that which he claims to have observed or if it is impossible under the laws of nature for the occurrence to have taken place at all. *Id.* Dennis's testimony in the instant action is not incredible as a matter of law. While his testimony may have been inconsistent and self-serving, nothing in

his testimony is impossible, nor did he testify as to any events which he could not have observed. The jury was aware of Dennis's role in the crime and inconsistencies between his in-court testimony and out-of-court statements and was entitled to determine Dennis's credibility and weigh his testimony as it saw fit. Based upon his testimony and the government's other evidence, it found Washington guilty. We may not reweigh Dennis's testimony. Thus, we affirm the verdict.

■■■■ Moreover, in arguing that the government presented no sufficient evidence aside from Dennis's testimony, Washington discounts the postal inspector's testimony that Washington was present at the apartment when the box was delivered and the I.D. and business cards which were admitted into evidence. While conceding that these items "suggest[ ] the possibility of his guilt," Washington maintains that this evidence is insufficient to sustain the verdict because "other explanations suggesting innocence are plausible." (Washington's Br. at 13). However, the government need not present evidence that excludes every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt. The evidence which the government presented to the jury met this burden. Thus, we affirm Washington's conviction.

### III.   Conclusion

Both defendants were well represented, but for the foregoing reasons, the convictions of Dennis and Washington must be AFFIRMED.

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

I join in the affirmance of the conviction of defendant James Brown, a/k/a Donald Ray Washington. The court correctly concludes that his contentions have no merit. I respectfully dissent, however, from the majority's affirmance of defendant Otha Dennis' conviction because, on this record, the authorities lacked reasonable suspicion to detain the mailed package that led to his conviction.

An intrusion into the normal passage of the United States mail traditionally has been treated as a matter of the utmost seriousness. The use of the mails to convey contraband and dangerous materials obviously requires that the traditional privacy that we associate with the carriage of the mails be tempered with a practical, realistic assessment of the needs of contemporary law enforcement. The United States Postal Service's drug package profile is no doubt an important and useful tool in establishing the probability that a particular package contains contraband. Nevertheless, the use of that profile in any particular decision to detain the mail must be an exercise of defensible professional law enforcement judgment before it can justify the detention of a package. In brief, a qualitative assessment of the significance of the particular factors determined to be present must justify the detention. The simple presence of several factors—without any particularized assessment of their meaning—offers no legitimate basis for the detention. "Mere mechanical matching of characteristics thought to be common to all drug couriers can never meet the rigorous requirements of the fourth amendment." *United States v. Hanson,* 801 F.2d 757, 762 (5th Cir.1986); *see also Reid v. Georgia,* 448 U.S. 438, 440–41, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980) (per curiam); *United States v. Sterling,* 909 F.2d 1078, 1083–84 (7th Cir.1990). Instead, "the detaining officers must have a particularized and objective basis for suspecting the particular person [or, in this case, the particular package] stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981); *see also United States v. Sokolow,* 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585–86, 104 L.Ed.2d 1 (1989); *Hanson,* 801 F.2d at 762 ("To be reasonable, an officer's suspicion must be specific and, to some extent, individualized to the particular characteristics exhibited...."). We must use our common sense in determining whether the articulated facts ought to raise the requisite suspicion. *See Cortez,* 449 U.S. at 418, 101 S.Ct. at 695.

In this case, Postal Inspector Moreno said that the package met four of the drug package profile's characteristics: The package was mailed (1) from Los Angeles, California, (2) by express mail, individual to individual, (3) heavily taped, and (4) from a zip code different from that of the return address. Although other permutations of the profile's factors might well render a package suspicious, the combination of these four factors produces a completely unremarkable situation, one that would surely include "a very large category of presumably innocent" packages. *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754.

To begin with, the City of Los Angeles had just under 3.5 million inhabitants in 1994 (one year before the seizure of Mr. Dennis' package). U.S. Bureau of the Census, *Statistical Abstract of the United States: 1996,* at 45. The population figure balloons to over 15 million if one includes the inhabitants residing in the surrounding metropolitan area. *Id.* at 41. Although Inspector Moreno could not provide precise numbers, he guessed that probably hundreds of thousands of parcels are sent through the express mail system daily. In fact, in 1995, 56.7 million pieces of express mail went through the postal system. U.S. Postal Service, *Annual Report of the Postmaster General: 1995,* at 39. If we assume that 5.5% of express mail packages are sent individual to individual,[1] over 3 million express mail items were sent person to person in 1995 alone. Such a mailing from the country's second most populous city is resoundingly unexceptional.

The zip code factor adds nothing of value to the mix. Los Angeles was assigned 101 zip codes for possible use in 1994, *see* 2 U.S. Postal Service, *National Five–Digit ZIP Code and Post Office Directory: 1995,* at 6–43, a number which does not include the numbers assigned to such nearby areas as, for example, Pasadena and Van Nuys. The package in this case was mailed from Inglewood, California-assigned 13 zip code numbers itself—and contained a Los Angeles return address. It should not raise an eyebrow that a citizen living in Los Angeles

---

1. In his affidavit, Inspector Moreno wrote that postal records indicate that about 5% of express mail correspondence is personal. At trial he estimated the correct percentage was 6%.

would mail a package from Inglewood. Even a Los Angeles resident mailing a package from Los Angeles could easily have the misfortune of satisfying this profile characteristic. Many of us not in the drug culture, and who reside in smaller cities, satisfy this factor every time we mail an item on the way to work.

Also disturbing is the high correlation between the zip code factor and the "source" city factor. It turns out that the Nation's "source" cities, like Los Angeles, are also the Nation's largest cities; they are by necessity covered by many zip codes, and their residents are therefore more likely to mail from a zip code different from that of their respective homes. Indeed, in some very large cities, it may be downright unlikely that the originating and return address zip codes would match. *See United States v. Ornelas–Ledesma*, 16 F.3d 714, 716–17 (7th Cir.1994) (noting that, not only were circumstances on which officers relied innocent by themselves, but "the confluence of the[ ] circumstances [was] pretty innocuous as well, especially since many of the circumstances [were] correlated rather than independent"), *vacated on other grounds, Ornelas v. United States*, —— U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

**2.** The majority favors a quantitative approach. It cites *United States v. Lux*, 905 F.2d 1379 (10th Cir.1990), which says that the presence of three of the profile's factors is enough to sustain a seizure, regardless of what the factors are. *See id.* at 1382 ("Here, the package met three factors of the Service's 'drug package profile', giving authorities sufficient reasonable suspicion...."). It is worth noting that, despite *Lux* 's broad language and the majority's liberal reading of it, the package in *Lux* bore a false return address. *See United States v. Hill*, 701 F.Supp. 1522, 1528 (D.Kan.1988) (case affirmed by *Lux;* noting that the return addressee and return address did not match).

The vast majority of cases deals with permutations of the profile's attributes that are more convincing than the permutation we have in our case. *See, e.g., United States v. Van Leeuwen*, 397 U.S. 249, 252, 90 S.Ct. 1029, 1032, 25 L.Ed.2d 282 (1970) (among other suspicious circumstances, package had fictitious return address); *United States v. Glover*, 104 F.3d 1570, 1576 (10th Cir.1997) (package detained because of a pattern of suspicious packages, knowledge that defendant's daughter was possibly involved in drug trafficking, and research that had revealed the names or addresses on the prior packages were fictitious); *United States v. Allen*, 990 F.2d

I turn, then, to whether the "heavy" taping of the package adds enough to sustain this seizure as one based on "particularized" suspicion. Common sense says not. Taping is simply indicative that the sender wants to secure the package's contents, whether they be dishes or drugs. Indeed, a mother is likely to tape the seams of a "care package" to ensure that her child's cookies arrive fresh to the college dormitory. There is no indication that the taping was so excessive as to violate the postal regulations; indeed, the package was accepted for mailing.

In sum, these four particular profile characteristics are innocent when considered independently and innocent when combined. Reasonable suspicion is not a numbers game; the inquiry must turn on whether the sum of the articulated facts is *qualitatively* significant.[2]

The government tries to shore up its case with the affidavit of the postal inspector purporting to explain the significance of the profile's factors. The government also reminds us that we must "give due weight to inferences drawn from [historical] facts by ... local law enforcement officers." *Ornelas*, —— U.S. at ——, 116 S.Ct. at 1663.[3] We

667, 671 (1st Cir.1993) (individual had received three express mail packages in five months, inspector knew that individual had received suspicious mailings from West Coast in past, the return addresses were different but in the same handwriting, and one of the senders had the same name as another who had previously mailed drugs); *United States v. Daniel*, 982 F.2d 146, 150 (5th Cir.1993) (package exhibited six of the profile's characteristics, including that. the package's size and shape belied a shipment of "parts," the alleged contents declared by the sender); *United States v. Martinez*, 869 F.Supp. 202, 205–06 (S.D.N.Y.1994) (facts included a tip from a confidential informant and different return addresses in the same handwriting); *United States v. Cantrall*, 762 F.Supp. 875, 879 (D.Kan. 1991) (several factors, including that the return address and return addressee did not match); *United States v. Holden*, No. 88–20105–01, 1989 WL 7914 (D.Kan. Jan.9, 1989) (including return address was fictitious; six packages had been sent in less than a year).

**3.** This passage from *Ornelas,* read expansively, is fast becoming a major threat to *Ornelas'* basic holding. Unless this development is scrutinized consistently by the Supreme Court, it may so

must remember that the overall import of *Ornelas* was to announce that probable cause and reasonable suspicion determinations are to be reviewed de novo—not deferentially—by the courts of appeals. In making that independent assessment, it is true that we are to give "due weight" to officers' inferences because of their law enforcement experience, but giving "due weight" does not mean abdicating our judicial responsibility to examine critically the reasons given by law enforcement agents for invasions of individual privacy.

Given the state of the record in this case, the inferences drawn by Inspector Moreno ought to be assessed with caution. The main support for his inferences is contained in two pages of an affidavit. This affidavit is conclusory in nature and reads more like an advertisement for the Postal Service than a statement of empirical fact. It tells us, for example, that express mail is favored by drug dealers because of the "speed, reliability, and low cost of this service." We are also told, in some contrast, that individuals (as opposed to corporations) rarely use express mail because it is too expensive. Neither of these propositions is supported by data or any other citation to authority. This lack of support is especially important because the affidavit is couched in terms of the collective experience of the Postal Service, not in terms of Inspector Moreno's particularized experience with packages that have the four characteristics of Mr. Dennis'. Indeed, Inspector Moreno focuses on the profile and on characteristics that are not involved in this case. For example, he notes that express mail is rarely used on a "consistent basis" for personal correspondence. Notably, although it has been considered suspicious in some

cases, *see supra* note 2, for a defendant to receive several express mail packages over a short time, when Mr. Dennis' package was detained, the inspector did not know, as far as the record reveals, of any other packages being involved in the case. His statement therefore is without relevance to the case before us. Inspector Moreno also says that drug dealers prefer express mail because they can utilize an 800 number to confirm the whereabouts of their packages. No data support this assertion and Inspector Moreno offers no basis for his having a view of the nationwide experience of the Postal Service. Moreover, there is no particularized indication that Mr. Dennis' modus operandi included use of the 800 number. On the key point of the nature of the package's taping, Inspector Moreno merely states that Mr. Dennis' package was heavily taped. He carefully asserts that this situation is "consistent" with—not characteristic of—narcotics packages.[4]

In short, the affidavit gives the judicial officer no real sense of the frequency with which express mail is used by drug dealers. Five to six percent of express mail packages—about 3 million packages in 1995—are mailed from an individual to an individual. But what percentage of those contain drugs? How many personal express mail packages are mailed from California? What percentage of the packages are heavily taped? What does the conclusory characterization "heavy taping" mean? What is Inspector Moreno's experience with these four seemingly innocuous factors? How many innocent packages have these four characteristics? How many guilty packages have them? What is the error rate?[5] We are not told

---

enfeeble *Ornelas'* holding as to keep in place, as a practical matter, the former deferential standard of this circuit.

**4.** Inspector Moreno informs us that California has acquired the devilish distinction of being labeled a "source" state. The criteria employed to bestow that title—or that of "destination" city or region—on a municipality or a region are vague. Indeed, at trial, Inspector Moreno testified that the entire West Coast qualifies, as well as many of the country's largest and most populous states: He volunteered as examples Texas, Florida, Arizona, and parts of the State of Washington. When specifically questioned about New

York, the inspector admitted that state's inclusion into the club as well. We, *see Ornelas–Ledesma,* 16 F.3d at 716 (noting that about one in eight Americans are from California), and the Supreme Court, *see Reid,* 448 U.S. at 441, 100 S.Ct. at 2754, have discounted the probative value of a defendant's connection to a "source" state. We ought not be impressed by the fact that a package was mailed from the Nation's most populous state.

**5.** There is some evidence, albeit anecdotal, that the profile's error rate is quite high. In *United States v. Hill,* 701 F.Supp. 1522 (D.Kan.1988), eighteen packages that matched various criteria

and no judicial officer has asked. Unfortunately, we do not have the opportunity to see the cases in which the Postal Service has pulled a suspected package only to find out that the package did not contain narcotics. Those cases result in no conviction and accordingly produce no appellant to complain. In sum, we have not been given the sort of information we need to do the job assigned to us by the Constitution.

There are, no doubt, particular permutations of the profile's factors that amount to "a particularized and objective basis for suspecting the particular [package] stopped." *Cortez*, 449 U.S. at 417, 101 S.Ct. at 694. Moreover, if the government, as it did for the Supreme Court in *Cortez*, were to fully explain its inferences and deductions, and their bases, other combinations of even the more innocent factors might sustain the government's burden.[6] In such circumstances, however, the Fourth Amendment requires that an officer explain "why his knowledge of the crime problem and ... of the practices of those planning or engaging in certain forms of criminal conduct gives special significance to what he observed." 4 LaFave § 9.4(a), at 142; *accord United States v. Buenaventura–Ariza*, 615 F.2d 29, 36 (2d Cir.1980) ("[T]he fact that an officer is experienced does not require a court to accept all of his suspicions as reasonable, nor does mere experience mean that an agent's perceptions are justified by the *objective* facts.") (emphasis in original). In these specialized law enforcement areas, where the federal judiciary lacks the agents' knowledge and where the confluence of factors is not readily suspicious to the untrained eye, the reviewing judicial officer must require more than "a wink and a nod" from the government before accepting its assertion that the suspicion was reasonable. It is the *judiciary's* responsibility to ensure that law enforcement authorities, in their admirable and at times courageous efforts to enforce the country's laws, continue to respect its most fundamental law, the Constitu-

tion. We cannot perform meaningful review without having been adequately informed of the nature and basis of the agents' inferences, knowledge and experience. Judge McAuliffe, who sits on the highest court of the State of Maryland, made the point well in a similar context:

> We cannot accept this assertion on faith alone. If the State is to argue that this combination of attributes is of special significance when viewed through the collective wisdom of the State police, it must provide an objective basis for its determination. In this case, however, the State has not disclosed any underlying statistics or data to explain why the combination of circumstances at issue here produces reasonable suspicion. No attempt was made to explain how this profile was formulated, or even whether empirical evidence which might lead to its development exists.
>
> . . . .
>
> Here, ... the officer did not attempt to offer his own experience or training as support for the conclusion that the characteristics of the local profile were related to the activities of a drug courier. A "profile" suggests that others, based upon their experience or collected empirical data, have made those conclusions. Where the characteristics of the profile suggest the conclusion for which the profile is offered as a matter of common knowledge and experience, the Court is able to test the validity of the inference. Where, as here, the aggregate of facts does not as a matter of common knowledge permit a reasonable suspicion that criminal activity is afoot, but requires explanation by reason of experience or empirical data that the witness advancing the conclusion does not have, something more will be required. Otherwise, the courts would be required to place blind faith in conclusions of absent law enforcement officials whose hypotheses or

of the profile were detained at Los Angeles Airport. Only three of those eighteen were eventually found to contain cocaine. *Id.* at 1526–27.

**6.** See 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.4(a), at 143 (3d ed.1996) (opining that the *Cortez* Court

properly relied on the inferences of trained law enforcement personnel to find a particularized basis for a stop because "the inferences and deductions had been fully explained at the suppression hearing").

statistical foundations cannot be tested for accuracy.

*Derricott v. State,* 327 Md. 582, 611 A.2d 592, 597 (1992), *quoted in* 4 LaFave § 9.4(e), at 174–75.

The government in this case offered no testimony from which to assess the effectiveness of this profile, especially in a situation in which only these four factors are present. Accordingly, in my view, it did not meet its burden of proving that a reasonable postal inspector would have suspected Mr. Dennis' package of containing contraband.[7]

Recently, the Supreme Court cautioned against making exceptions to the Fourth Amendment that are tailored to the drug culture. *See Richards v. Wisconsin,* —— U.S. ——, —— – —— & n. 4, 117 S.Ct. 1416, 1420–21 & n. 4, 137 L.Ed.2d 615 (1997) (stating that an exception based on the " 'culture' surrounding a general category of criminal behavior" is inappropriate and that "[i]t is always somewhat dangerous to ground exceptions to constitutional protections in the social norms of a given historical moment"). Today the court dilutes the requirements of reasonable suspicion. By accepting the government's justification on faith, the court waters down the traditional duty of Article III judges to evaluate critically a government officer's request to invade by seizure a citizen's privacy and thus enfeebles the protections of the Fourth Amendment.

Today, despite the Supreme Court's admonition, the court interprets the requirements of the Fourth Amendment to meet the exigencies of the current drug problem that plagues the Nation. Yet the rules that we now formulate to expedite the eradication of that scourge also will set the vectors of our jurisprudence for other situations and, indeed, for other times. The "hydraulic pressure" of which Justice Holmes spoke in *Northern Securities Co. v. United States,* 193 U.S. 197, 400–01, 24 S.Ct. 436, 486, 48 L.Ed. 679 (1904) (dissenting opinion), is transforming the shape of the Fourth Amendment into a form quite different than that intended by the Founding Fathers. We want to give our children a drug-free society. But we also want to give them the constitutional polity forged at Lexington, Concord and Philadelphia. Today's case might promote the first goal, but it retards the second. With respect, I cannot join that portion of the court's judgment that ratifies such an approach.

---

**7.** *Cf. United States v. Ho,* 94 F.3d 932, 937–38 (5th Cir.1996) (holding that government did not satisfy burden of proving reasonable officer would have had probable cause to arrest defendant because suspicious nature was not readily apparent and the government elicited no testimony from which to gauge the extent of officer's knowledge and experience in the area of credit card fraud). *See generally United States v. Pavelski,* 789 F.2d 485, 490 (7th Cir.) ("The Government has the burden of establishing the reasonableness of an investigatory stop and accompanying search."), *cert. denied,* 479 U.S. 917, 107 S.Ct. 322, 93 L.Ed.2d 295 (1986); *United States v. Longmire,* 761 F.2d 411, 417–18 (7th Cir.1985) (holding that government bears the burden of establishing that officer had reasonable suspicion justifying seizure).