# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3271

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| vs. | * | District of Nebraska |
| | * | |
| Rodolfo C. Terriques, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: January 14, 2003
Filed: February 24, 2003

_____

Before WOLLMAN, and MURPHY, Circuit Judges, and GRITZNER,[1] District Judge.

_____

GRITZNER, District Judge.

Rodolfo Terriques (Terriques) appeals the order of the district court[2] denying his motion to suppress. The court held the evidence obtained as the result of the

---

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]The Honorable Richard G. Kopf, Chief Judge, United States District Court for the District of Nebraska adopted the Report and Recommendation of United States Magistrate Judge David L. Piester, denying Terriques' motion to suppress.

seizure of a United States Postal Express Mail package was not obtained in violation of his Fourth Amendment rights. We affirm.

## I.    Background

On August 20, 2001, United States Postal Express Mail Clerk Robert Leon intercepted a package which is the subject of this appeal. Leon has worked at the Phoenix Air Mail Center (AMC) as an Express Mail clerk for six years. At AMC, Express Mail clerks manually sort and route the Express Mail which arrives from Arizona postal stations. In a typical day, Leon handles an average of two hundred Express Mail items. He takes each item from a hamper, observes its mailing label, determines its destination, and places it into the appropriate sack for travel to that destination.

During his six years at AMC, Leon has never received formal training in drug interdiction. However, through on-the-job training and interaction with interdiction officers, Leon has obtained a working knowledge of the characteristics associated with the shipment of illegal drugs and has personally identified over two hundred packages which were found to contain controlled substances. Leon considers several factors in identifying a package as suspicious including whether the package has an odor, whether an attempt has been made to mask odor, such as heavy taping or perfume, which postal station was used to mail the package, the return address, and the destination address.

At about 4:00 p.m. on August 20, 2001, while sorting incoming mail, Leon picked up a "solid"[3] Express Mail package, approximately ten inches square, all

---

[3]Leon explained the contents of a "solid" package are packed so tightly that nothing inside moves around. He further explained this is atypical; most packages, with the exception of those containing frozen foods, allow noticeable movement of the contents when the package is handled.

seams sealed with clear shipping tape, and addressed to "Martin Sanchez" of Lincoln, Nebraska. Leon recognized the return address of 2822 W. Van Buren. It was located in the Phoenix neighborhood where he grew up and where his mother still lives. Leon had been in the neighborhood earlier that day dropping his son off at his mother's home. Leon knew 2822 W. Van Buren was located in a run down, low income, high crime section of the neighborhood. He also knew 2822 W. Van Buren was in a business area; however, Leon observed the return addressee was "Ramon Alvarado", the name of an individual rather than a business. In addition to the irregularities of the return address, Leon noticed the sender paid cash and mailed the package from the main post office in Phoenix, ten miles away from 2822 W. Van Buren. Leon knew there was a postal station located only about one-half mile from 2822 W. Van Buren. Leon believed these combined factors suggested possible drug trafficking.

Leon's practice when coming across a suspicious package is to bring the package to the postal inspectors if they are present; if they are not present, he calls law enforcement. On August 20, 2001, postal inspectors William Randall (Randall) and Gregory Popp (Popp) were present at AMC conducting an interdiction operation. Both inspectors are highly trained and experienced in the investigation and identi-fication of narcotics packages. Leon promptly turned the package over to inspectors and told them his suspicions about the return address and the fact the package had been mailed from the main post office rather than a postal station nearer to 2822 W. Van Buren. Leon had no further involvement with the interdiction.

Upon receipt of the package, the inspectors noticed the heavily taped seams – a technique commonly used to mask drug odors. Given his own observations and the information Leon provided, Randall made arrangements with Maricopa County Sheriff Deputy Douglas Doyle to conduct a "dog sniff" with a narcotics detection dog. The dog is certified to detect certain controlled substances and has worked in narcotics detection since January of 1998. At 5:44 p.m., the dog gave a positive alert

to the package, indicating the presence of illegal drugs. The package was scheduled to be placed on the 7:00 p.m. air transport to Omaha; however, based on the information Randall had obtained, including the irregularities in the return address, the fact the package was mailed from a high crime area, and the positive canine alert, Randall secured the package until a search warrant could be obtained.

On the evening of August 20, 2001, Randall continued his investigation by driving to 2822 W. Van Buren. He found commercial buildings but was unable to locate that specific address. The following day, with the help of Benjamin James, the United States postal clerk who worked that neighborhood, Randall discovered a seafood restaurant named Mariscos Bahia De Lobos was located at 2822 W. Van Buren. James stated "Ramon Alvarado" was not a name he recognized as receiving mail at that address.

On August 21, 2001, Randall shared the results of his investigation with Popp. Based on this information, Popp prepared an affidavit and an application for a search warrant. A search warrant was issued, and the inspectors carefully opened the bottom of the package. Inside the package, Randall and Popp discovered manila envelopes wrapped in duct tape which appeared to contain illegal drugs. After photographing the contents, the package was resealed with a metal tamper-proof seal and sent by plane to Omaha Postal Inspector Clay Reeves (Reeves) for a controlled delivery.

Reeves, who is also trained and experienced in drug enforcement, received the package on August 22, 2001. He performed a more extensive search and found the package contained clothes and three padded envelopes containing a total of 1,024.3 grams of cocaine and 213.62 grams of methamphetamine. One of the drug packages was placed back into the original white shipping box and resealed; the remaining drug packages were turned over to the Lincoln Police Department.

Later on August 22, 2001, Reeves, along with officers from the Lincoln Police Department Narcotics Task Force, arranged for a controlled delivery of the package to the listed destination address of 4221 Holdrege Street, Apt. #18, Lincoln, Nebraska. When Reeves arrived at the apartment complex, Terriques was outside and approached Reeves. Terriques asked Reeves if the package was for Martin Sanchez; Reeves replied that it was. The two men went to apartment number 18 so Terriques could retrieve some identification. Terriques produced a resident alien card displaying his photograph with the name "Martin Sanchez". Terriques signed for the package, and Reeves left. After leaving the apartment complex, Reeves advised the Lincoln police officers that Terriques accepted the package. A search warrant for apartment number 18 was obtained and executed. The unopened package was found in the bedroom closet still containing the methamphetamine. Terriques was found outside the apartment complex and arrested.

On November 15, 2001, Terriques was indicted on one count of violating 21 U.S.C. § 841(a)(1) and (b)(1)(A). Terriques filed a motion to suppress the drug evidence discovered in the package, arguing Express Mail clerk Leon did not have reasonable and articulable suspicion when he removed the package from the stream of mail. He further argued all evidence obtained subsequent to that "seizure", including the evidence derived through search of the package pursuant to a search warrant and controlled delivery, should be deemed inadmissable as fruit of the poisonous tree.

## II.    Discussion

This court reviews "the district court's conclusions of law de novo and its findings of fact for clear error." United States v. Yousif, 308 F.3d 820, 827 (8th Cir. 2002); United States v. Johnson, 171 F.3d 601, 603 (8th Cir. 1999) ("We review the findings of fact for clear error and the ultimate question whether there was reasonable suspicion of criminal activity de novo.").

Terriques argues the district court erred in denying his motion to suppress because authorities improperly detained the package. To comport with Fourth Amendment protections, postal inspectors "'must possess a reasonable suspicion based on articulable facts that a package contains contraband before they may detain the package for inspection.'" United States v. Vasquez, 213 F.3d 425, 426 (8th Cir. 2000) (quoting Johnson, 171 F.3d at 603).

To determine whether Terriques' Fourth Amendment rights have been violated, we must first determine when the package was seized. "Seizure" occurs when there has been meaningful interference with an individual's possessory interest in his property. United States v. Demoss, 279 F.3d 632, 635 (8th Cir. 2002) (citing United States v. Jacobsen, 466 U.S. 109, 113 (1984)). Mere handling of a package does not constitute seizure. Id. (reasoning "there could be no expectation the package would not be handled or that its physical attributes would not or could not be observed" when placing a package in the stream of mail). By paying postage and placing a package into the care of the United States Postal Service, "the sender virtually guarantee[s] that any characteristic of the package that could be observed by the senses would be so observed. . . . And there is no legitimate expectation law enforcement would not be among the observers." Id. Furthermore, it takes a matter of seconds for an Express Mail clerk to evaluate a package; such brief interference does not constitute detention. Id.; Vasquez, 213 F.3d at 426. Detention does not occur until authorities remove a package "from the stream of mail." Vasquez, 213 F.3d at 427.

As an Express Mail clerk, Leon handles and observes packages as part of the sorting process. He determines the appropriate sack the package should be placed in for transport to its final destination by observing the mailing label. When Leon made his observations of the package in this case, only slight interference with the package occurred; it did not delay or interfere with the processing of the package. See Demoss, 279 F.3d at 635-36 (finding interference by lifting a package from the

conveyor belt and observing it was insignificant and did not constitute seizure for Fourth Amendment purposes); Vasquez, 213 F.3d at 427 (finding examination of the outside of the package and subjecting the package to a dog sniff while it sat on the rear of a truck did not constitute detention because the package was not removed from the stream of mail). Therefore, the package was not detained for Fourth Amendment purposes when Leon made his observations and handed the package to Popp and Randall.

Terriques asserts the package was subject to Fourth Amendment guarantees when Popp and Randall decided to detain it. We agree. After Popp and Randall made their own observations about the package, considered the observations of Leon, and then Randall secured the package in order to obtain a warrant, seizure of the package occurred. It is at this point the inspectors exhibited dominion and control over the package for their own purposes. Garmon v. Foust, 741 F.2d 1069, 1072 (8th Cir. 1984) ("'[T]he decision by governmental authorities to exert dominion and control over the package for their own purposes clearly constituted a 'seizure' . . . .'") (quoting Jacobsen, 466 U.S. at 122 n.18)).

We do not agree, however, that Terriques' Fourth Amendment rights were violated. A seizure will not violate the Fourth Amendment if the authorities have "reasonable suspicion based on articulable facts that a package contains contraband before they . . . detain the package for investigation." Johnson, 171 F.3d at 603 (citing United States v. Van Leeuwen, 397 U.S. 249, 251 (1970)). Reasonable suspicion exists when "an officer possesses a 'particularized and objective basis' for suspecting that the package contains contraband, that is more than an 'inchoate and unparticularized suspicion or hunch.'" Id. (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)). In determining whether the inspectors had reasonable suspicion, the court evaluates "those circumstances as they would be 'understood by those versed in the field of law enforcement.'" Demoss, 279 F.3d at 636 (quoting United States v.

<u>Cortez</u>, 449 U.S. 411, 418 (1981)).  The constitutionality of a government agent's suspicion is intensely fact specific.  <u>Id.</u>

In the present case, Popp and Randall possessed a particularized and objective basis for suspecting the package contained contraband.  First, the inspectors had the training and experience[4] necessary to allow them to draw "'inferences and deductions that might well elude an untrained person.'"  <u>Johnson</u>, 171 F.3d at 603 (quoting <u>Cortez</u>, 449 U.S. at 418)).  They knew heavy taping of all seams was a technique used in drug trafficking to mask drug odor.  Furthermore, the inspectors had reason to rely on the information provided by Leon.  In his six years at AMC, Leon intercepted over two hundred packages found to contain contraband.  In addition, the inspectors knew Leon had personal knowledge of the Phoenix area.  The details Leon shared with the inspectors were all indicators of possible drug trafficking: the return address was fictitious; the return address was located in a high crime area; the label listed an individual's name but the address was in a business area; and the package was mailed at a postal facility quite a distance away from the return address.  The inspectors stated these were factors used in their decision to detain the package for further inspection.

Terriques suggests these factors are consistent with innocent activity; he does concede, however, the combination of these factors may give rise to reasonable suspicion when observed by experienced officers.  <u>Demoss</u>, 279 F.3d at 636.  Terriques

_____

[4]In his Report and Recommendation, Magistrate Judge Piester commented on the "drug package profile" developed by the postal service.  The profile was developed based upon traits repeatedly found in Express Mail packages discovered to contain drugs.  The traits include:  (1) the shape and size of the package; (2) whether the package is taped to close or seal all openings; (3) whether the labels are handwritten or printed; (4) whether the return name and address are unusual; (5) whether there are unusual odors coming from the package; (6) whether the return address is fictitious; and (7) the destination of the package.  <u>United States v. Lux</u>, 905 F.2d 1379, 1380 n.1 (10th Cir. 1990); <u>United States v. Daniel</u>, 982 F.2d 146, 150 (5th Cir. 1993).

argues a similar combination of innocent factors were found in <u>United States v. Johnson</u>, and that this court held those factors did not give rise to reasonable suspicion. We disagree.

In <u>Johnson</u>, this court found the factors the government relied on to detain an Express Mail package were not supported by reasonable suspicion of criminal activity. <u>Johnson</u>, 171 F.3d at 604. There, an inspector detained a package because he observed a handwritten address label which listed the same return and destination address but different zip codes. <u>Id.</u> The only other factor the inspector observed was that the address was in a narcotics "source" state (California). <u>Id.</u> In finding the government failed to demonstrate reasonable suspicion, we did not point to the innocent nature of these factors; rather, we focused on the government's failure to provide a basis for the inspector's suspicions. <u>Id.</u> We found the government failed to demonstrate the inspector's "experience with handling packages that match the profile, his assessment of which combinations of profile characteristics are indicative of criminal activity, or whether that assessment is well-founded in light of the inspector's experience." <u>Id.</u>

The determination of reasonable suspicion does not require that we "rule out the possibility of innocent conduct." <u>United States v. Arvizu</u>, 534 U.S. 266, 276, 122 S. Ct. 744, 753, 151 L. Ed.2d 740 (2002). We view the totality of circumstances, some of which may seem innocent in isolation. Here, the government has demonstrated both Popp and Randall are trained drug interdiction inspectors; the inspectors articulated the profile characteristics they used to assess the package for detention, and those characteristics were based on their experience. They stated their own observation of the heavily taped seams on the package as well as the credible observations Leon made about the return address. These factors combined gave rise to reasonable suspicion the package contained contraband.

Terriques argues the heavy taping is an innocent factor which does not give rise to reasonable suspicion. For this premise, he relies on the dissenting opinion of United States Judge Ripple, Circuit Judge, Seventh Circuit Court of Appeals, in United States v. Dennis, 115 F.3d 524, 537 (7th Cir. 1997). In Dennis, the majority found the confluence of otherwise "innocent" factors, when appraised by experienced postal inspectors trained in narcotics detection, amounted to reasonable suspicion. Id. at 531-32. The four factors the inspectors found were: (1) the package was heavily taped; (2) it was mailed from an individual to an individual; (3) it was mailed to a drug "source" city; and (4) it was mailed from a zip code different than the zip code of the return address. Id. at 533. Judge Ripple disagreed with the majority, reasoning these four factors taken apart or in combination were innocent and did not give rise to reasonable suspicion. Id. at 537 (Ripple, J., dissenting). We agree with the Dennis majority.

This court has repeatedly reasoned heavy taping is one of several factors which, when found in combination, may give rise to a reasonable suspicion to detain a package. See, e.g., United States v. Gomez, 312 F.3d 920, 923 (8th Cir. 2002) (finding a heavily taped Express Mail package "virtually begged for the attention of a postal inspector"); Demoss, 279 F.3d at 636 (noting heavy perfume odor and excessive taping combine to give rise to reasonable suspicion to detain an Express Mail package). Moreover, in Johnson, we cited the Dennis majority with approval finding heavy taping is "a circumstance perhaps more suspicious than the others in the profile." Johnson, 171 F.3d at 605 n.2.

Popp and Randall are experienced interdiction officers. They articulated the heavy taping of the package and the irregularities in the return address gave rise to their suspicion the package contained contraband. Considering the totality of the circumstances, we find the inspectors had reasonable suspicion based on articulable facts at the time they detained the package; therefore, the seizure of the package was not in violation of Terriques' Fourth Amendment rights.

We affirm the judgment of the district court.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.